## MACMILLAN CO. v. KING.

(District Court, D. Massachusetts. June 24, 1914.)

No. 360.

1. COPYRIGHTS ⬥⟿60—INFRINGEMENT—OTHER "VERSION" OF COPYRIGHTED BOOK.

Sheets of memoranda, prepared for and used in the tutoring of students in the subject-matter of a copyrighted text-book, which are given or lent to each student, and contain, besides occasional quotations of words and sentences from the book, a reproduction, so far as is possible in an abridged and paraphrased form, of the author's treatment of the subject, are an infringement, under Copyright Act March 4, 1909, c. 320, § 1, 35 Stat. 1075 (Comp. St. 1913, § 9517), which gives the owner the exclusive right to "make any other version" of the copyright work.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 56; Dec. Dig. ⬥⟿60.]

2. COPYRIGHTS ⬥⟿55—INFRINGEMENT—PRINTING.

Typewriting or mimeographing constitutes a "printing," within the meaning of the copyright statutes.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 52; Dec. Dig. ⬥⟿55.

For other definitions, see Words and Phrases, First and Second Series, Print.]

3. COPYRIGHTS ⬥⟿55—INFRINGEMENT—"PUBLICATION."

It is not necessary, in order to constitute a "publication" of a work in infringement of a copyright, that copies should be offered in the market to all who choose to buy; but there may be such publication, which will entitle the owner of the copyright to an injunction, although the number of persons to whom copies are delivered is limited, and their rights to the copies also limited by agreement with them.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 52; Dec. Dig. ⬥⟿55.

For other definitions, see Words and Phrases, First and Second Series, Publication.]

4. COPYRIGHTS ⬥⟿86—SUIT FOR INFRINGEMENT—INJUNCTION.

Proof of actual damages is not necessary to warrant the granting of an injunction to restrain infringement of a copyright, if infringement appears and damages may probably follow from its continuance.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 79, 80; Dec. Dig. ⬥⟿86.]

In Equity. Suit by the Macmillan Company against Melaim Lenoir King. On final hearing. Decree for complainant.

Henry L. Burnham, of Boston, Mass., for plaintiff.

John E. Eaton and Mitchell, Chadwick & Kent, all of Boston, Mass., for defendant.

---

DODGE, District Judge. The defendant is charged with infringing the plaintiff's copyright in "Principles of Economics," a work in two volumes by F. W. Taussig, Professor of Economics in Harvard University, published in 1911 by the plaintiff, and copyrighted under the act of 1909. The bill alleges that the defendant has—

"printed, published, and leased or sold unauthorized, unfair, and unlawful abridged copies or other versions of said book."

An injunction and accounting is prayed for. 35 Stat. 1075.

The Copyright Act of 1909 secures to the owner of a copyright in a literary work an exclusive right to "print, reprint, publish, copy and vend the copyrighted work" (section 1a), and to "make any other version thereof" (section 1b). It provides that the copyright shall "protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting." Section 3 (Comp. St. 1913, § 9519).

The answer denies the allegations above quoted from the bill. The defendant alleges that he is a teacher by profession; that numerous persons come to him for private instruction in various subjects, one of them being economics; that in teaching economics he makes use of and teaches the contents of the copyrighted book; that the book is sold for use as a text-book, and is studied by his pupils as such, and that they resort to him for aid in such study; that each of his pupils is recommended and expected to possess a copy of the book, and in general does so; that all of them possess copies, so far as he knows; and that if any do not is a matter beyond his control, copies being accessible in the libraries or in the hands of friends to them all; that in advance of each conference relating to the subject with his pupils, he prepares for them brief memoranda or outlines covering the ground to be dealt with; that each of these consists of a single sheet of typewritten matter, relating only to the subject-matter to be dealt with at the conference; that, if any sheet is taken away after the conference, an account is kept, and it is returned the next week; that all are subsequently destroyed; that none are sold or leased; that they are not bound or paged; that no use is made of them, apart from the use above described; that they go into his pupils' hands only on the understanding that they are to be used by the individual pupil and returned as above; that, except as stated, they are not published or distributed; and that his regular fees for instruction are fixed without regard to the use of the memoranda, and are the same whether the memoranda are used or not.

He alleges, further, that what he does as above is within the license and consent given by implication in distributing and selling the books, is within the custom of teachers, and is not an infringement of the complainant's copyright.

The defendant's allegations as to the actual use he has made of his "memoranda" are in general supported by the evidence, except that certain memorandum sheets, nine in number (marked Exhibit II), appear by his own testimony to have been prepared by him for use, not at a particular conference dealing with a particular part of the book, but for tutoring in preparation for a final examination in one of the

Harvard courses in economics; and that these were intended to outline all the subject-matter covered in that course during a certain term. These he said he loaned to the pupils tutored in that course, to be kept for "a few days," to be returned, not the next week, but immediately after the examination. It did not appear how long before the examination they were loaned. They were put in evidence by the plaintiff, in whose possession they were at the time, and appear, therefore, not to have been in fact returned to the defendant by the pupils to whom he loaned them.

[1] 1. Are the memoranda referred to such in character as to constitute "copies" or "other versions" of the copyrighted work, within the meaning of the act, if printed, reprinted, or published, within the meaning of the act?

I first consider 30 sheets of the memoranda, furnished for use as evidence by the defendant himself, and agreed to be specimens of all by a preliminary stipulation made by both parties May 9, 1913, before any other evidence had been taken in the case. That "materials for said memoranda or outlines were drawn from" the copyrighted book is also expressly agreed in the same stipulation.

The 30 conferences with his pupils, for which the defendant prepared these memoranda sheets, were to be on successive dates, never at a less interval than one week, beginning with October 6, 1911, and ending with May 24, 1912. The conferences appointed for four dates in October and for November 3 and 10 would seem never to have been actually held, although sheets for those dates were prepared. On the remaining dates conferences were held, and a sheet of memoranda prepared for each was used.

The memoranda sheets used on December 8, 15, and 22, besides dealing with parts of the copyrighted book, dealt also with parts of a different book upon the same subject, by another author, and in no way involved in this case. The sheets prepared for or used on the other dates deal each with a part of the copyrighted book. Certain chapters of the book, occupying in all not quite 60 of its more than 1,100 pages, are not dealt with in any of the sheets. The remaining chapters of the book may be said to be covered by the remaining sheets taken together; but the order of the book was not followed throughout in the successive conferences, earlier portions of it being sometimes passed over until after later portions had been dealt with.

Occasional portions of some of the sheets do no more than refer to the book for its treatment of a particular topic, the reference conveying little or no notion to the student of what is found in the book about the topic. Examples are:

(Feb. 16, under heading Taussig on Interest)
9. Rate differs in different countries. Why?
10. Justification of interest—for and against.
(Feb. 23.) Industrial Crises: (a) Periodicity—1818, 1825, 1837, 1847, 1857, break, 1873, 1884, 1893; also a double pulsation (severe, mild); some world-wide, some limited; (b) Jevon's theory of sun-spots and its value.

If the defendant's sheets had been constructed upon this plan throughout (and without infringement of the copyrighted index), it might be said that he had done no more than provide students with

visible means to aid their study of the book, which would relieve their memories of the task of retaining in proper order the principal matters treated of, and had done nothing which amounted to substantial reproduction of any of the author's treatment. The defendant offered in evidence several so-called printed outlines or abstracts prepared by other teachers for use in connection with other books. These appeared, generally speaking, to be constructed according to the plan just described. As to two of them, wherein a further use of the author's ideas is made, one appears to have been copyrighted by the author, the other by its maker, with permission from the owner of a copyright covering the English translation of the book.

The defendant's sheets certainly make a much more extensive use of the author's ideas than is made in such occasional passages as the two above quoted. For the most part they consist of paragraphs more nearly like the following:

(March 8) Taussig on Taxes on Land and Buildings:
"(a) The peculiarity of the tax on land is that it cannot be shifted, but falls on the owner. If a sale takes place, the buyer deducts the tax and is tax free—'burdenless' taxation. (b) On the other hand, the tax on buildings can be shifted (except where demand is declining), and is shifted, to the occupier, who in turn, if he is a merchant, shifts it to the purchaser of his goods."

(April 25) Taxes on Land and Buildings: (a) A tax on land "which is 'rackrented' cannot be shifted, and is no burden to the owner. (b) A tax on buildings can be shifted to tenant, because buildings cost just so much to erect. Where building is used for business, tenant may shift again to consumers. (c) According as the value of a property is in the land or in the building, the owner pays more or less, and as value of land rises, taxes rise, and thus some of unearned increment is appropriated. (d) It makes practically no difference whether tax is collected from owner as in U. S., or from occupier as in England, that is if the taxes are fixed in amount. If the rate is altered, then it does make a difference. European and American basis of assessment also differ, the 1st being annual rental value, the 2d selling value. Each has advantages and disadvantages. (e) Workingmen pay taxes on dwellings, shops, etc., either directly or indirectly. In England the owner serves as tax collector, without tenant knowing it (unfortunate). (f) In English-speaking countries, taxes on real estate are chiefly local taxes. 'The same tendency is beginning to show itself on the continent,' and the system is a wise one."

Chapter 68, pp. 515–527, of volume II of the copyrighted book, is entitled "Taxes on Land and Buildings," and is divided into sections numbered consecutively from 1 to 6. In the clauses (a) and (b) of both the above extracts, prominent propositions contained in sections 1 and 2, respectively, are (somewhat roughly) condensed, everything said in the section by way of proof, modification, illustration, or application being disregarded. In the clauses (c), (d), (e), and (f) of the second extract the same thing is done with regard to sections 3–6, inclusive, of the chapter.

It will be noticed that clause (a) contains one word, and clause (f) an entire sentence, in quotation marks. The words so quoted are taken direct from the book. Instances of such quotation are frequent throughout the sheets. They are generally short, consisting of one or two words only; the words selected being usually such as would be likely to catch the attention and remain in the memory. Instances of

entire sentences quoted are not so common, though there are several of them. The language of the book is sometimes followed, without being distinguished by quotation marks, though not for more than a few words at a time, so far as I have noticed.

I next consider the nine pages of memoranda which were put in evidence by the plaintiff while cross-examining the defendant (Exhibit H). These, as has been stated, were also prepared by the defendant from the book, for use in "tutoring" his pupils for a final examination upon all the work in economics supposed to have been done by the students at the University who had taken that course during the second term of the year 1911–1912; and they were so used. They correspond generally to the memoranda sheets prepared for his conferences on February 16 and on successive dates thereafter until and including May 24. The portions of the book to which they relate are, in general, the same as those covered by the memoranda sheets for the conferences referred to; but the latter contain matter necessarily omitted from Exhibit H, into whose nine consecutive pages is further condensed what had occupied 15 of the separate memoranda sheets. What has been said above of the memoranda sheets will serve to describe what is found in Exhibit H. In it, as in them, there is frequent quotation of words, and occasional quotation of sentences from the book; the topics treated are topics treated in the book, the attempt is made to reproduce in abridged and paraphrased form (so far as such reproduction is possible within the very narrow limits adopted) the author's treatment of the topics selected, and the author's order and arrangement of topics within the portions of the book dealt with is followed, except for a certain amount of transposition or repetition.

It seems to me that the defendant's method of dealing with the book has resulted in an appropriation by him of the author's ideas and language more extensive than the copyright law permits. It is true that the whole book has not been thus dealt with; but the copyright protects every substantial component part of the book, as well as the whole. Though the reproduction of the author's ideas and language is incomplete and fragmentary, and frequently presents them in somewhat distorted form, important portions of them are left substantially recognizable. If they had not been so left, the defendant's evident purpose could not have been accomplished. It seems obvious that what he was trying to give, and what his pupils were trying to get, was an acquaintance with the contents of the book, which should resemble as much as possible that acquaintance which they would have obtained for themselves by following with sufficient diligence the University course of instruction for which the book was the appointed text-book. Nor do I see any reason to doubt that, as the author testifies, these "outlines" might readily "cause the student to think he (could) meet the minimum requirements without using the book itself." It cannot be said that the outlines go no further than to "give just enough information to put the reader upon inquiry" regarding the contents of the book. It was because the alleged infringing "version" went no further than this that no infringement was found by the court in G. Ricordi & Co. v. Mason (C. C.) 201 Fed. 182–185 (on appeal 210 Fed. 277, 127 C. C. A. 125).

It gave in half a page an abridged synopsis of the copyrighted libretto of an opera, covering 46 pages. It was said, in refusing the preliminary injunction (201 Fed. 183):

"The abridgments which have been condemned by the courts involve colorable shortening of the original text, where immaterial incidents are omitted and voluminous dissertations are cut down, but where the characters, the plot, the language, and the ideas of the author are pirated."

It was further said on final hearing (201 Fed. 185):

"Of course, if the defendant's stories consisted of mere modifications of the copyrighted works, or abridgments thereof, reproducing portions of the dialogue, words, or phrases, the scenes, and characters, a different question would be presented."

Following here a similar principle of distinction, I must hold that the defendant's sheets are not, in any event, such abridgments from the copyrighted book as he has the right to make, and that they constitute "versions" of substantial portions of the book, such as the plaintiff alone has the right to make.

[2] 2. The defendant has neither leased nor sold his sheets. "Printing" I must regard as including typewriting or mimeographing, for the purposes of the act, and he has therefore "printed" them. Can he be said to have "published" them, as the bill alleges, in such sense as to make his publication an infringement, entitling the plaintiff to an injunction?

[3] It is not necessary, in order to constitute publication, that they should have been offered in the market to whoever chose to buy them. There may be a limited publication, which will entitle the owner of the copyright to an injunction. Ladd v. Oxnard (C. C.) 75 Fed. 703, 730. And, as held in that case, there may be such publication, although the number of persons to whom copies are delivered is limited, and their rights to the copies also limited by agreement with them. Although the defendant issued the infringing sheets only to his own pupils, and to them only upon agreement that they should be returned to him within a limited time, the evidence relating to Exhibit H shows either that the agreement was not fulfilled in every case, or that these sheets were copied before being returned. No precautions against such copying appear to have been taken. I must hold that sufficient publication of the outlines has been shown to constitute infringement.

If the above conclusions are right, I am unable to believe that the defendant's use of the outlines is any the less infringement of the copyright because he is a teacher, because he uses them in teaching the contents of the book, because he might lecture upon the contents of the book without infringing, or because his pupils might have taken their own notes of his lectures without infringing.

[4] 3. The evidence can hardly be said to show that the infringing outlines have injured the sale of the book. Nothing more appears than that they might do so, by enabling students to get along without the book who otherwise would have had to buy it. The plaintiff's loss, if any, prior to the filing of the bill, can hardly have been of substantial amount, because the two volumes of the book were copyrighted, respectively, on September 25 and October 4, 1911, and the bill was filed

June 7, 1912. The outlines prepared and used by the defendant during the University year 1911–12 are thus the only ones involved in the case as it now stands. The defendant's uncontradicted evidence is that the number of students who used his outlines, whether in conference classes or in separate tutoring for examinations, did not exceed 15 at the first and 17 at the second term of the year. The evidence shows, however, that outlines similar to Exhibit H, though not precisely the same, were prepared from the book by the defendant and used during 1912–13 in tutoring for mid-year and final examinations. If an injunction is refused, it is obvious that continued use of similar outlines, such as that heretofore made, may well result in damage more substantial than any shown by the evidence thus far submitted. Proof of actual damage is not necessary for the issuance of an injunction, if infringement appears and damage may probably follow from its continuance. Reed v. Holliday (C. C.) 19 Fed. 325, 327; Sampson, etc., Co. v. Seaver, etc., Co. (C. C.) 134 Fed. 890; Id., 140 Fed. 539, 72 C. C. A. 55. It is understood that no accounting is desired by the plaintiff, and an injunction only is sought. To that I think the plaintiff is entitled, and there may be a decree accordingly.