**LOEW'S INCORPORATED, a corporation and Patrick Hamilton, Plaintiffs,**

v.

**COLUMBIA BROADCASTING SYSTEM,** Inc., a corporation, et al., Defendants.

No. 15602.

United States District Court
S. D. California, Central Division.

May 6, 1955.

 

Loeb & Loeb, Los Angeles, Cal., Allen E. Susman, Harry L. Gershon, Herman F. Selvin, Los Angeles, Cal., for plaintiffs.

Wright, Wright, Green & Wright, Los Angeles, Cal., Richard M. Goldwater, Los Angeles, Cal., for defendant, Jack Benny.

O'Melveny & Myers, Los Angeles, Cal., Homer I. Mitchell, W. B. Carman, Ernest M. Clark, Jr., Los Angeles, Cal., for defendants, Columbia Broadcasting System, Inc., and American Tobacco Co.

JAMES M. CARTER, District Judge.

This is an action for infringement of copyright pursuant to Title 28 U.S.C.A. § 1338(a) and Title 17 U.S.C.A. Ch. 2, §§ 101 to 116. A cause of action for unfair competition has been joined pursuant to Title 28, § 1338(b). Plaintiffs have waived damages and seek only an injunction.

The case presents novel questions in the law of literary property and is a case of first impression. It presents a major issue—Is a charge of copyright infringement, where the defendant has taken a substantial part of the copyrighted work, defeated by the fact that the appropriated material was used in or as part of a burlesque or parody of the copyright work, rather than in or as part of a serious or independent work? Stated in another way, is a burlesque, which takes a substantial part of a copyrighted motion picture, a fair use?

Loew's Inc., hereafter Loew's, seeks to enjoin Columbia Broadcasting System Inc., hereafter C.B.S., American Tobacco Company, hereafter American, and Jack Benny, hereafter Benny, from the performance of a humerous sketch, "Autolight," burlesquing the motion picture, "Gaslight," the literary property of Loew's.

In addition to denials of various of the allegations of Loew's complaint, defendants set forth three affirmative defenses.

1. That the use made by the defendants of "Gaslight" was a fair use, since it was a burlesque;

2. That Loew's complaint is barred by laches;

3. That the use by the defendants of "Gaslight" was a fair use, in that no one viewing the burlesque could reasonably think he was viewing the motion picture, and in that the showing of the burlesque did not and will not satisfy, in whole or in part, the demand that may exist or may have existed, for said motion picture.

Prior to December 5, 1938, Patrick Hamilton, a British subject and one of the plaintiffs [1] conceived and wrote an original play entitled "Gaslight." The play was first published in the English language and copies of the play were first issued to the public in England, on February 17, 1939. By virtue of the British Copyright Act of 1911, this constituted publication and the work was immediately protected,[2] and shortly

---

1. Hamilton was joined as plaintiff through the abundance of caution of plaintiff's counsel. It was stipulated at the trial that this action involves solely the alleged violation of Loew's copyright. We do not reach questions concerning an author's alleged right to a character he has created. See Warner Bros. Pictures v. Columbia Broadcasting System, D.C.S.D.Cal., 1951, 102 F.Supp. 141, 147, affirmed and modified 9 Cir., 216 F.2d 945; certiorari denied 75 S.Ct. 532; Burtis v. Universal Pictures Co., Inc., 1953, 40 Cal.2d 823, 835, 256 P.2d 933.

2. Under the British Copyright Act of 1911, publication is defined as "the issue of copies of the work to the public, and does not include the performance of a dramatic of musical work * * *". Unpublished works are fully protected by copyright if the author "was at the time of the making of the work a British subject." Copyright protection runs during the life of the author and for 50 years after his death. Hamilton is still alive.

thereafter was publicly performed, first in Richmond and later in London, both in England.

On November 18, 1941, Hamilton deposited in the United States Copyright office a copy of the edition published in England,[3] and on December 5, 1941, this dramatic composition opened on Broadway under the name "Angel Street." The drama was successful, running 1,295 consecutive performances, extending over a period of more than thirty seven months. In September 1942, the play "Gaslight" was republished in the United States under the name of "Angel Street" and Hamilton copyrighted this publication in the United States.[4]

The exclusive motion picture rights of "Gaslight" were acquired by Loew's from Hamilton and his assignee on October 7, 1942,[5] and commencing in December of that year Loew's expended $2,458,000 in the production and distribution of an original motion picture photoplay of the drama. The production by Loew's involved the labor and skill of many persons, employing the services of Charles Boyer, Ingrid Bergman and Joseph Cotton, artists in the cinema field. The actual making of the film extended over a period of almost two and one-half years before it was released in national and international distribution on May 5, 1944. Thereupon, Loew's copyrighted the motion picture photoplay.[6]

The picture "Gaslight" was exhibited by Loew's and its licensees in the United States, U. S. Army and Navy installations here and abroad, and in fifty-six foreign countries. Approximately 52,000,000 persons paid admission here and abroad to see the picture and approximately $4,857,000 was received in gross rental.

The picture was withdrawn from domestic release in November 1946. The international distribution still continues. It is a customary and usual practice in the motion picture industry to reissue pictures which have been highly successful in their initial release, five or more years after their first release. Substantial rentals are often received for such reissues. Loew's have not reissued "Gaslight." The script and the film is in evidence and the film has been viewed by the court.

On or about October 14, 1945, during Loew's domestic distribution of "Gaslight", Benny, a performer in the field of comedy, caused to be written, produced, performed, and broadcast over a national radio network, a half hour show featuring a fifteen minute burlesque of the drama "Gaslight" with Benny and Ingrid Bergman in the leading roles. American was at this time sponsor of the show.

Loew's did not have prior notice of the Benny show, except as shown by Benny's testimony, hereafter. Bergman furnished to Benny's writers her copy of the shooting script of the motion picture "Gaslight." Loew's did not have notice of her act nor did it consent thereto. Prior to the preparation of the script, the Benny writers viewed the motion picture "Gaslight," and the stage play "Angel Street." Clearly the defendant Benny, had *access* to the copyrighted material. The point is not in issue. A record transcription of this radio program is in evidence and has been heard

---

3. Hamilton received a Certificate of Copyright Registration. It is conceded Hamilton had a valid copyright.

4. The republication in 1942 contained notice of the 1939 copyright by Hamilton and the additional words, "Copyright 1942 (Acting Edition) by Patrick Hamilton." Hamilton received a Certificate of Registration from the Registrar of Copyrights. No issue is raised concerning the validity of this copyright.

5. No attack is made on the assignment. Nor are we concerned with its scope or extent or type of right transferred to Loew's. Loew's paid $150,000 for its rights.

6. The motion picture photoplay "Gaslight" was first published with Loew's notice of copyright affixed, on May 5, 1944. Loew's received a Certificate of Registration. No issue is raised as to the validity of the copyright.

by the court. A script of the program is also in evidence.

The radio program was publicly performed at the U. S. Army Redistribution Center in Santa Barbara, California, and from there put on the National Broadcast system.

However, it was stipulated that if Benny were called as a witness, he would testify that prior to this performance and to enable the prospective audience to fully appreciate the burlesque, Benny had requested of Loew's that a print of the then current photoplay "Gaslight" be sent to the Center for exhibition in the week preceding the radio program, and that Loew's furnished such a print. In the performance of the burlesque Benny burlesqued Charles Boyer, the male star in the picture, and Miss Bergman, appearing as Benny's guest star, performed a travesty upon her original screen role in "Gaslight." No claim of infringement was even made regarding this burlesque.[7] We credit Benny's testimony and find the radio program was done with Loew's consent.

More than six years later, on January 27, 1952, C.B.S. caused to be written and produced a Benny half hour television program featuring Benny and Barbara Stanwyck in the leading roles. This was again a burlesque of "Gaslight," and was on January 27, 1952, broadcast over the C.B.S. networks, and sponsored by American. Again the burlesque occupied about fifteen minutes of the half hour show, this performance however, being in an audio-visual medium made some use of stage props. The actual performance was kinescoped [8] for transmission over those stations of the C.B.S. network, which were physically unable to receive the live broadcast. A copy of the film of television program and the script is in evidence and the court has seen the film. Benny received compensation for his services from C.B.S. and C.

B.S. received compensation from American.

Loew's, on January 30, 1952, despatched a letter to C.B.S. inferring that they considered the latter burlesque an infringement of their property. Loew's further notified C.B.S. that they intended to "enforce our rights if they be infringed." C.B.S. acknowledged receipt of this letter but denied infringement claiming "fair use" including the "right to parody literary properties." Loew's then informed C.B.S. that the program constituted a copyright infringment. The dispute was not settled.

About May 28, 1953, C.B.S. commenced the preparation of a motion picture for television, burlesquing "Gaslight" and starring Benny and Barbara Stanwyck. On June 9, 1953, Loew's received notice that defendants contemplated this further remake of the "Gaslight" burlesque for the Benny television show. On June 9, 1953, Loew's gave notice that they considered the prior performance and the proposed remake, an infringement of their copyright.

Loew's commenced this action on June 10, 1953, and a restraining order was issued. It was modified by consent to permit the filming of the proposed television show and the film was impounded by court order. A copy is in evidence and has been viewed by the court. It was stipulated that defendants intend to and will, unless and except as restrained by this court, exhibit and cause to be exhibited the film throughout the United States over all the television channels and networks of C.B.S. Prior to June 10, 1953, C.B.S. had paid or obligated itself in the sum of $54,167 for the cost of the script and filming of the proposed television show.

The program was planned for the year commencing September 1953. The

---

7. The terms *burlesque* and *travesty* are not used here in a technical sense. See infra for definitions thereof.

8. A process of recording any event on motion picture film for later broadcast or rebroadcast over television networks or stations.

parties have stipulated that Benny's television program, between September and December 1953 reached from 6,073,000 to 8,882,000 homes and 18,826,000 to 27,534,000 viewers, the exact number differing on various dates.

## I.

### There was a Substantial Taking by Defendants.

A detailed comparison of plaintiffs' "Gaslight" and defendants' "Autolight" appears in the margin.[9] The compari-

9. In view of the clear evidence of a substantial taking, we do not burden this decision with a comparison of dialogue.

### I. *Generally*

| Benny TV Program | MGM's "Gaslight" |
|---|---|
| 1. Locale: London | London |
| 2. Period: 1871 when story begins. | "Early 1870's" when story begins. |
| 3. Main setting: Gloomy old 4-story house. | Gloomy, old 4-story house |
| 4. Characters: | |
| (a) Husband "CHARLES Manningham" (played by Benny) murdered a woman *15* years ago in this very house; married present wife so that "in the guise of an English gentleman" he can pursue search for jewels of murdered woman. He is following plan of driving his wife insane. He goes out nightly, sneaks back into attic to search. Is finally captured by man from Scotland Yard. | (a) Husband "Gregory Anton" (played by CHARLES Boyer) murdered a woman *10* years ago in this very house; married present wife (who inherited house) so he can pursue search for jewels of murdered woman. He is following plan of driving his wife insane. He goes out nightly, sneaks back to attic to search. Is finally caught by man from Scotland Yard. |
| (b) Wife, "BELLA Manningham" much in love with husband; pained that he leaves her alone night after night; worried she is losing mind; asks for his sympathy; she is victim of husband's plan to drive her insane; learns of husband's past; asks to see husband alone before he is taken away, and taunts him then calls Inspector. | (b) Wife, "PAULA Anton" much in love with husband; pained that he leaves her alone nightly, fears that she is losing mind; asks for husband's sympathy; Ditto |
| (c) *Scotland Yard Inspector* "INSPECTOR" (Played by Noble) Has been watching house for some time; comes to call on wife when husband out; tells her of husband's past, the murder of a woman in this house years ago; in talking with wife, Inspector gets her to admit she knows it is her husband prowling in the attic who makes strange noises there at night. Upon return of husband, Inspector has hidden, but appears when husband is bullying wife; places husband under arrest; allows wife to talk with husband alone a few moments while he waits outside door, then at her call, comes back and takes husband away into custody. We feel there is affection between Inspector and wife. | (c) *Scotland Yard Inspector* "Brian Cameron" (Played by Joseph Cotton) Ditto |
| (d) *Maid "ELIZABETH"* Question by husband about picture out of place; denies touching it. | (d) Maid "ELISABETH" Ditto |
| (e) *Other servant in house:* Butler, "Jeeves." | (e) *Other servant in house:* Maid, "Nancy." |

son leads the court to the following conclusions of fact; (1) that the locale and period of the works are the same; (2) the main setting is the same; (3) the characters are generally the same; (4) the story points are practically identical; (5) the development of the story, the treatment (except that defendants' treatment is burlesque), the incidents, the sequences of events, the points of suspense, the climax are almost identical and finally, (6) there has been a detailed borrowing of much of the dialogue with some variation in wording. There has been a substantial taking by defendants from the plaintiffs' copyrighted property. This the defendants impliedly, though not in so many words, con-

## II. *Story Points*

(a) Husband pursuing a sinister, diabolical scheme to drive wife crazy.

(b) Husband murdered a woman years ago in this very house.

(c) Husband marries present wife, comes to this very house, so he can search for jewels of murdered woman, in attic.

(d) In order to search, husband leaves wife night after night, and pretends he is going elsewhere, actually coming back to own attic.

(e) Husband's method of driving wife insane, includes following—

(1) Telling her she is always forgetting things;

*TV program:* Wife "doesn't remember" things she does, husband tells her.

*MGM script:* Wife inclined to lose things and forget things, husband tells her.

(2) Puts picture(s) out of place, then accuses wife of having done this and forgotten it:

*TV program:* Turns 2 pictures upside down.

*MGM script:* Takes little picture off wall and hides it.

(3) Confines wife to her room, and he goes out night after night.

(4) Humiliates wife in front of servant(s) by calling her in to be questioned when picture found out of place.

*TV program:* (Maid, Elizabeth, is quizzed)

*MGM script:* (Maids, Elizabeth and Nancy are quizzed)

(5) Husband's searching for jewels in attic, has following effects which increase idea of wife's insanity:

(a) When he turns on gaslight in attic, lights in her room go lower; then later when he turns off gaslight in attic, her lights in her room come up higher again.

(b) His search in attic (makes queer noises) (has queer effect).

*TV program:* Wife complains of headaches, but when Inspector explains her husband was up in attic searching for jewels she says her headache is gone.

*MGM script:* Wife thinks she's hearing imaginary footsteps in attic.

(f) Husband calls in servants, after he has misplaced picture, questions them, in order to cast suspicion on his wife.

(g) Husband tells wife she is getting hysterical, and should sit down and calm herself:

(h) Husband asks why wife does these crazy things; says she is insane:

(i) Running idea that wife forgets things:

(j) Gaslights go down after husband leaves, and come up just before he returns:

(k) Wife pleads for sympathy and kindness from husband:

(l) Inspector from Scotland Yard, has been watching house, comes to visit wife when husband out, tells her of husband's dark past, reassures her of her sanity, captures husband.

(I) Watching house

(II) Visits wife

(III) Tells of husband's crime

(IV) Reassures wife of sanity

(V) Captures husband

(m) Husband returns, starts to bully wife again, when Inspector comes on scene.

(n) Wife asks to speak to husband alone, before Inspector takes him away; Inspector finally agrees and waits outside room within call.

*TV program:* Inspector ties up husband because wife asks to talk with him alone.

*MGM script:* Inspector already had tied husband up.

(o) Husband, tied up in chair, tries to talk wife into getting knife and cutting him loose.

*TV program:* Knife in desk.

*MGM script:* Knife in cupboard.

(p) Wife pretends she is going to release husband by cutting bonds with knife, then frightens him by implying instead she will kill him with the knife, then calls Inspector.

cede. We say impliedly, because the defendants defend on the ground that they have made a burlesque of "Gaslight;" that such is "fair use;" that plaintiffs are barred by laches, and finally that the value of Loew's "Gaslight" has not been impaired and that Loew's have not and will not suffer damage.

■■ It is well settled law that the owner of a copyright is entitled to be protected against the taking of a substantial portion of his protectible material. Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354, at page 361, where the court said: "The whole picture need not be copied to constitute infringement. The mere copying of a major sequence is sufficient." Sheldon v. Metro–Goldwyn Pictures Corp., 2 Cir., 1939, 81 F.2d 49, 56, "* * * it is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Ansehl v. Puritan Pharmaceutical Co., 8 Cir., 1932, 61 F.2d 131, 137, "A copy of a 'substantial part' constitutes an infringement", and cases cited therein. "* * * when a study of the two writings is made and it is plain from the study that one of them is not in fact the creation of the putative author, but instead has been copied in substantial part exactly or in transparent re-phrasing to produce essentially the story of the other writing, it infringes." Warner Bros. Pictures v. Columbia Broadcasting System, 9 Cir., 1954, 216 F.2d 945, 950, certiorari denied 75 S.Ct. 532.

Folsom v. Marsh, C.C.Mass.1841, 9 Fed.Cas. page 342, No. 4901, is one of the earliest cases on copyright law in the United States. The case concerns a "Life of Washington" which the court found infringed an earlier copyrighted work. The court met the issue as to how much taking constitutes an infringement. Justice Story's opinion, widely quoted, laid down the rule that the test is not alone quantitative but qualitative. The Justice said that courts must look, page 348 "to the nature and objects of the selections made, the quantity and value of the materials used * * *." and at, page 348, "It is certainly not necessary, to constitute an invasion of copyright, that the whole of a work should be copied, or even a large portion of it, in form or in substance." Story v. Holcombe, C.C.Ohio, 1847, 23 Fed.Cas. pages 171, 173, No. 13497, said:

"The infringement of a copyright does not depend so much upon the length of the extracts as upon their value. If they embody the spirit and the force of the work in a few pages, they take from it that in which its chief value consists. * * *"

■■ Although ideas, abstract conceptions and similar matters are not protectible, on the other hand it is clear that the author's manner of treatment, expression, the incidents and details, and the sequence of events by which he works out and develops the abstractions, are copyrightable elements of his work, and will be protected. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, at page 54; "* * * others may 'copy' the 'theme,' or 'ideas,' or the like, of a work, though not its 'expression.'" Dam v. Kirk La Shelle Co., 2 Cir., 1910, 175 F. 902, 907; Mac Donald v. Du Maurier, 2 Cir., 1944, 144 F.2d 696, 701; De Acosta v. Brown, 2 Cir., 1944, 146 F.2d 408, 409–410; certiorari denied, Hearst Magazines v. De Acosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L. Ed. 1983; Barsha v. Metro-Goldwyn-Mayer, 32 Cal.App.2d 556, 561–562, 90 P.2d 371, 374, "Although there can be no property in an author's ideas, 'there may be literary property in a particular combination of ideas or in the form in which ideas are embodied.' Fendler v. Morosco, 253 N.Y. 281, 171 N.E. 56, 58."

If this was the ordinary plagiarism case, without the defense of burlesque as a fair use, it would be crystal clear, under the controlling authorities, that there had been access, a substantial taking and therefore infringement.

We are thus brought face to face then with the major issue in the case. Is

a substantial taking of a copyrighted property permissible when the taking is by use of burlesque and rests for justification on the theory of fair use? We also discuss the additional defenses asserted.

## II

### The Extent of the Doctrine of Fair Use

#### (a) Generally

Copyrights and the rights flowing therefrom are entirely creatures of statute. Pursuant to the constitution [10] Congress enacted the Copyright Act [11] and "instead of sanctioning an existing right * * * created it;" Wheaton v. Peters, 1834, 8 Pet. 591, 660–661, 8 L.Ed. 1055. Thus, "the protection given to copyrights in this country is wholly statutory." White-Smith Music Pub. Co. v. Apollo Co., 1908, 209 U.S. 1, 15, 28 S.Ct. 319, 322, 52 L.Ed. 655.

"By the common law, the author of a writing possesses the sole and exclusive right to publish it, but upon and after the first publication the writing may be published by anyone including the author, since the writing has gone into the public domain. Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Bobbs-Merrill Co. v. Straus, 2 Cir., 1908, 147 F. 15, 15 L.R.A.,N.S., 766; Harper & Bros. v. M. A. Donohue & Co., C.C.1905, 144 F. 491. The copyright statute extends the author's sole and exclusive right in accordance with its terms and provisions. Constitution of the United States, Art. I, § 8, Clause 8; Title 17 U.S. C.A.; Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Bobbs-Merrill Co. v. Straus, 2 Cir., 1908, 147 F. 15, 15 L.R.A.,N.S., 766. In other words, it reserves the writing from the public domain for the effective period of the copyright. What we have just said is what is meant by courts when they say: 'When the copyright comes in, the common law right goes out.' * * *'" Warner Bros. Pictures v. Columbia Broadcasting System, 9 Cir., 1954, 216 F. 2d 945, at page 948; certiorari denied 75 S.Ct. 532.

The history of the copyright statutes show an extension, legislatively, to the creator of protectible material.[12] The first copyright statute in 1790 gave protection to authors for fourteen years and by renewal for fourteen years more. The period has been increased by statute [13] to twenty-eight years with a renewal period in certain cases to the proprietor, and in others to the heirs of an author.

When case law held that abridgements or condensations and foreign translations of copyrighted works, were not an infringement, Story v. Holcombe, C.C.Ohio 1847, 23 Fed.Cas. page 171, No. 13497; Stowe v. Thomas, C.C.Pa.1853, 23 Fed.Cas. page 201, No. 13514, statutes amendatory of the copyright laws gave protection.

Judicially, the courts have taken a broad view of copyright protection in order to give to the copyright proprietor the exclusive right "to any lawful

10. U.S.Const. Art. 1, § 8, Clause 8.

11. Act of May 31, 1790, c. 15, 1 Stat. 124.

12. The original subjects of copyright under Act of May 31, 1790, were confined to maps, charts, or books. Historical and other prints were added by Act of April 29, 1802, 2 Stat. 171. Musical compositions were included in the revision of 1831, Act Feb. 3, 1831, c. 16, 4 Stat. 436. Under Act Aug. 18, 1856, 11 Stat. 138, authors of dramatic compositions, in addition to the sole right to print and publish were given sole right to act, perform and represent such composition. Photographs and negatives thereof were provided for under Act March 3, 1865, c. 126, 13 Stat. 540. The Act of July 8, 1870, c. 230, § 86, 16 Stat. 212, which was superseded by provisions of the Act of March 4, 1909, c. 320, 35 Stat. 1082, included also painting, drawing, chromo, statue, statuary, as well as models or designs, as proper subjects of copyright.

13. Act of Feb. 3, 1831, c. 16, 4 Stat. 436.

use of his property whereby he may get a profit out of it. \* \* \*" King Features Syndicate v. Fleischer, 2 Cir., 1924, 299 F. 533, 536.

■ The purpose of the copyright laws are well summarized in Mazer v. Stein, 1954, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630:

"'The copyright law, like the patent statutes, makes reward to the owner a secondary consideration.' United States v. Paramount Pictures, 334 U.S. 131, 158, 68 S. Ct. 915, 929, 92 L.Ed. 1260. However, it is 'intended definitely to grant valuable enforceable rights to authors, publishers, etc., without burdensome requirements; "to afford greater encouragement to the production of literary (or artistic) works of lasting benefit to the world."' Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 36, 59 S.Ct. 397, 400, 83 L.Ed. 470. \* \* \* Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered."

■ The doctrine of fair use [14] arises from the essential nature of the copyright. While a patent "'confers an exclusive right to use \* \* \* a copyright contemplates and permits fair use by all persons of the copyrighted work. \* \* \*' 18 C.J.S., Copyright and Literary Property, § 92, p. 213", Karll v. Curtis Publishing Co., D.C.Wis.1941, 39 F. Supp. 836, 837.

Fair use and its companion fair comment have been widely discussed by the writers.[15] Ball in Law of Copyright and Literary Property states:

"The right of subsequent authors, publishers and the general public to use the works of others to a *limited extent* has always been universally recognized as consistent with the object of publication and the policy of encouraging the dissemination of knowledge, learning and culture; \* \* \*" (p. 259)

\* \* \* \* \*

"Fair use may be defined as a privilege in others than the owner of a copyright to use the copyrighted material in a) *reasonable manner* without his consent, notwithstanding the monopoly granted to the owner by the copyright. Fair use is technically an infringement of copyright, but is allowed by law on the ground that the appropriation is *reasonable and customary.*" (p. 260). [Italics added.]

The right of fair use clearly exists, but the general statements of the text writers must be reduced to specifics in order to understand and define the extent and application of this right.

*(b) The impact of commercial gain or profit.*

■ It will be noted that Sec. 1, Title 17, U.S.C.A., consisting of five subdivisions, refers to doing the prohibited act "for profit" only in subd. (c) concerning a "lecture, sermon, address or similar production, or other nondramatic literary work", and subd. (e) referring to "musical composition." The subdivisions concerning dramatic works which we are here concerned with, (b) and (d), make no such reference to "for profit."

---

14. Occasionally, the courts have referred to the right to use the non-copyrightable material in a copyrighted work as "fair use." Sheldon v. Metro-Goldwyn Pictures Corp., supra, 81 F.2d at page 54; Towle v. Ross, 32 F.Supp. 125, at page 127; Warner Bros. Pictures v. Columbia Broadcasting System, D.C.S.D.Cal., 102 F.Supp. 141, 148–149. In that meaning the question is only the conventional one in copyright cases, i. e., was the appropriated material, copyrightable. Prima-

rily, however, the concept referred to as "fair use" relates to the extent to which copyrightable or protectible material may be used without express license.

15. Chaffee, Reflections on the Law of Copyright, 45 Col.Law Review 503; Drone on Copyrights, p. 398; Nicholson, Manual of Copyright Practice, p. 86; Shaw, Literary Property In the United States, pp. 67–71; DeWolf, An Outline of Copyright Law, pp. 97–98.

We assume that the words, "for profit" were used advisedly by Congress and insofar as a dramatic work is concerned, there may be infringement without a showing that the infringing was done for a profit.

But the factor of use for commercial gain has been considered by the courts in connection with most, if not all, infringements of copyrighted material, regardless of the particular subdivision of Sec. 1, Title 17 U.S.C.A., which is invoked. Thus, in the field of science and the fine arts, we find a broad scope given to fair use. "This doctrine permits a writer of scientific, legal, medical and similar books or articles of learning to use even the identical words of earlier books or writings dealing with the same subject matter." Thompson v. Gernsback, D.C.N.Y.1950, 94 F.Supp. 453, 454. The writer of such works "invites reviews, comments and criticism"[16] and we could add, the *use* of the books and portions and quotations therefrom for the purpose of the advancement of learning. He does not invite or consent to its use for commercial gain alone.

 "* * * the law permits those working in a field of science or art to make use of ideas, opinions, or theories, and in certain cases even the exact words contained in a copyrighted book in that field. Sampson & Murdock Co. v. Seaver-Radford Co., 1 Cir., 140 F. 539. This is permitted in order, in the language of Lord Mansfield in Sayre v. Moore, 1 East 361, 102 Eng. Reprint 139, 'that the world may not be deprived of improvements, nor the progress of the arts be retarded.' In such cases the law implies the consent of the copyright owner to a fair use of his publication for the advancement of the science or art", said Judge Maris of the Third Circuit, then District Judge, in Henry Holt & Co., Inc., v. Liggett & Myers Tobacco Co., D.C.Pa.1938, 23 F. Supp. 302, 304. We do not think Judge Maris's use of the word *art* was used in a sense broad enough to include a T.V. program allegedly taken from a motion picture.

 Criticism is an important and proper exercise of fair use. Reviews by so-called critics may quote extensively for the purpose of illustration and comment.[17]

As we draw further away from the fields of science or pure or fine arts, and enter the fields where business competition exists we find the scope of *fair use* is narrowed but still exists.

The impact of competition is shown in the field of publishing law books where the decisions are somewhat confusing. Using copyrighted law digests to run down cases and copying "lists of cases";[18] taking citations contained in a copyrighted work to cite in another work;[19] and obtaining "cumulative citations and histories of the affirmances and reversals of cases" from a copyrighted work "for annotation purposes"[20] have all been termed a fair use. But by the same cases, *other and more extensive use has been labeled infringement.*

A synopsis of an opera,[21] or indices[22] of a copyrighted property may be properly made under the rule of fair use. The use of a copyrighted credit book for the

16. Yankwich—What is Fair Use. Vol. 22, Univ. of Chicago Law Review, 203–209.

17. Amdur on Copyright Law and Practice, p. 757; Ball on Copyright and Literary Property, p. 287; Nicholson, Manual of Copyright Practice, p. 86; Lawrence v. Dana, C.C.Mass.1869, 15 Fed.Cas. pages 26, 60, No. 8136; Folsom v. March, C.C.Mass.1841, 9 Fed.Cas. page 342, No. 4901.

18. West Pub. Co. v. Edward Thompson Co., 2 Cir., 1910, 176 F. 833, 838 (dictum; other acts infringed).

19. Edward Thompson Co. v. American Law Book Co., 2 Cir., 1903, 122 F. 922.

20. W. H. Anderson Co. v. Baldwin Law Book Co., 6 Cir., 1928, 27 F.2d 82, 89, but taking of citations held an infringement.

21. G. Ricordi & Co. v. Mason, C.C.N.Y. 1911, 201 F. 182, 184, affirmed, 2 Cir., 1913, 210 F. 277.

22. Kipling v. G. P. Putnam's Sons, 2 Cir., 1903, 120 F. 631, 635.

purpose of ascertaining the name of persons and corporations engaged in business for use in another's work [23] is not infringement.

On the other hand, the taking of word lists, amounting to less than 15% of the printed matter, from French language books and adding thereto, when both "books met exactly the same demand on the same market" was an unfair use,[24] and the taking of three sentences from a doctor's copyrighted medical work by a tobacco company to advertise its cigarettes was not a fair use.[25] Where a newspaper used in an article, factual material taken almost verbatim from the copyrighted material in a rival newspaper, there was an unfair use even though the taking was "such a little one."[26]

Where a competing biography of Hans Christian Andersen leaned heavily on the copyrighted volume, and there was a copying of substantial and material parts of the book, fair use was not a defense.[27] The copying of choruses of a copyrighted song was a copying of a substantial and material part, in an action between competing publication companies.[28]

In connection with the showing of a movie, the fact that there was played only "short excerpts" of a copyrighted song, is no defense.[29]

Certain conclusions can be drawn from these cases. Judge Yankwich stated in a recent article:[30]

"If the amount reproduced is legitimately necessary to review the book, or is a part of a scientific or other exposition of the subject, in which the theories expounded by others must be discussed, the use, *regardless of quantity*, is fair. If, on the other hand, the appropriation of the copyrighted product of another is motivated by the desire to derive commercial benefit, the use, *regardless of quantity*, is unfair. * * *" [Italics added.]

We have some question as to the breadth of the conclusions, more particularly to the second sentence, but think the statement generally correct. It was obviously made to point up the impact of commercialism on the doctrine of fair use. We would conclude that the purpose for which the use was made is of major importance, in consideration with various other factors, in arriving at a sound determination of the extent of fair use; that broader scope will be permitted the doctrine where the field of learning is concerned and a much narrower scope where the taking is solely for commercial gain.

*(c) American cases referring to parody or burlesque.*

Turning now to American cases involving parody or burlesque,[31] we find illuminating early decisions. The attempt to defend against copyright infringement by the claim that the infringing work was "merely a parody or

23. Dun v. International Mercantile Agency, C.C.N.Y.1903, 127 F. 173.

24. College Entrance Book Co. v. Amsco Book Co., 2 Cir., 1941, 119 F.2d 874, 876.

25. Henry Holt and Co., Inc., v. Liggett & Myers Tobacco Co., D.C.Pa.1938, 23 F. Supp. 302.

26. Chicago Record-Herald Co. v. Tribune Ass'n, 7 Cir., 1921, 275 F. 797.

27. Toksvig v. Bruce Pub. Co., 7 Cir., 1950, 181 F.2d 664.

28. Johns & Johns Printing Co. v. Paull-Pioneer Music Corp., 8 Cir., 1939, 102 F.2d 282.

29. Harms v. Cohen, D.C.Pa.1922, 279 F. 276, 278.

30. What is Fair Use, 22 Univ. of Chicago Law Review, 203, 209.

31. It will be noted that the words "burlesque", "parody," "satire" and "travesty" are often used interchangeably. They do have certain technical distinctions, i. e., "parody" is usually the imitation of style or form; "satire" often carries the connotation of bitterness; "travesty" is synonymous with "burlesque" but is sometimes used to mean a long burlesque.

Encyclopoedia Britannica, Fourth Ed., Vol. IV, page 423, "Burlesque. A form of the comic in art, consisting broadly in

burlesque" is not new. Such an attempt has been the subject of several decisions and has been disposed of, not by determining whether the alleged infringing use was parody or burlesque, but by ascertaining whether it amounted to a taking of substantial, copyrightable material. In other words, a parodized or burlesqued taking is treated no differently from any other appropriation. Bloom & Hamlin v. Nixon, C.C.E.D.Penn.1903, 125 F. 977, involved the burlesque by Fay Templeton of the performance of one Lotta Faust in another dramatico-musical work, by singing the *chorus* of a copyrighted song and imitating the peculiar actions, gestures and tones of Miss Faust. Relief was denied and the court observed, "surely a parody would not infringe the copyright of the work parodied, merely because a few lines of the original might be textually reproduced." 125 F. at page 978. The case stands for the proposition that where a small or unsubstantial part of the copyrighted material was used, the principal part of defendants' performance, being stage business, there is no infringement.

Hill v. Whalen & Martell, Inc., D.C.N.Y.1914, 220 F. 359, involved the dramatization of plaintiff's copyrighted cartoon strip,[32] Mutt and Jeff. The defendant was held to have infringed, even though defendant contended the infringing production, "was a mere parody or burlesque of the original, and was so intended." 220 F. at page 359. A reading of the case shows a substantial taking. Though the court based its decision on the tendency of the infringing work to decrease the demand for the original (a point we consider infra) it is clear that the defense based on a right to burlesque was rejected.

The dividing lines between permissible and nonpermissible parody is strikingly illustrated by two of the cases which are found immediately next to each other in the reports—Green v. Minzensheimer, C.C.N.Y.1909, 177 F. 286, and Green v. Luby, C.C.N.Y.1909, 177 F. 287. In the first of these cases a parodized imitation of an actress' manner of style of singing a song, but in which no copyrighted material owned by the plaintiff was used, was held nonactionable. On the other hand, in the Green v. Luby case, where, in addition to mimicry or parody of the mannerisms of an actress who frequently sang it, a copyrighted song was sung, infringement was found. The court said in the Luby case, 177 F. at page 288:

"The next question is one of infringement. The defendant admits that she sings the copyrighted song with musical accompaniment, but she says that she does so merely to mimic the complainant Irene Franklin Green. She contends that she gives impersonations of various singers, including said complainant, and, as incidental to such impersonations, sings the songs they are accustomed to sing. *The mimicry is said to be the important thing; the particular song, the mere incident.* But I am not satisfied that, in order to imitate a singer, it is necessary to sing the whole of a copyrighted song. 'The mannerisms of the artist impersonated,' to use the language of the defendant's brief, may be shown without words. And

an imitation of a work of art with the object of exciting laughter, by distortion or exaggeration, by turning for example, the highly rhetorical into bombast, the the pathetic into the mock-sentimental, and especially by a ludicrous contrast between the subject and the style, making gods speak like common men and common men like gods. While parody (q. v.) also based on imitation, relies for its effect more on the close following of the style of its counterpart, burlesque depends on broader and coarser effects."

32. Another cartoon strip case is Nat'l Comics Publications v. Fawcett Publications, 2 Cir., 1951, 191 F.2d 594, holding a trial judge improperly dismissed a complaint alleging that Fawcett's Captain Marvel in Whiz Comics, and other magazines, infringed the Superman strip.

if some words are absolutely necessary, still a whole song is hardly required. And if a whole song is required, it is not too much to say that the imitator should select for impersonation a singer singing something else than a copyrighted song. Bloom [& Hamlin] v. Nixon, C.C., 125 F. 977, is distinguishable in that in that case the chorus only of the copyrighted song was sung. Green v. Minzensheimer (decided by this court March 19, 1909) 177 F. 286, is distinguishable in that in that case the defendant imitated the singer without musical accompaniment, and the testimony as to just what she did was not clear." [Emphasis added.]

### (d) Other modes

The question as to whether the protection given the proprietor of the copyright extends to other modes or forms of using or exhibiting his work would seem to be answered in the affirmative by the foregoing cases. Before we proceed to additional cases on that point, we note the statute itself.

Sec. 1, Title 17 U.S.C.A., reads in part,—

"*Exclusive rights as to copyrighted works.* Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right: * * * (b) to * * * make *any other version* [33] thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; * * * (d) to perform or represent the copyrighted work publicly if it be a drama * * *; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in *any manner or by any method* be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce or reproduce it in *any manner or by any method* whatsoever; * * *." [Emphasis added.]

Obviously the words "manner" and "method" are words of ordinary meaning, and must have different meanings or both would not have been used. But we do not rest our decision on the language of the statute and so do not decide whether "manner" is broad enough to cover burlesque.

The cases have considered the question as to other modes for the use of the copyrighted work but generally without reference to the express language above referred to. In King Features Syndicate v. Fleischer, 2 Cir., 1924, 299 F. 533, at page 535, the court said:

"*Copying is not confined to a literary repetition, but includes various modes in which the matter of any publication may be adopted, imitated, or transferred with more or less colorable alteration.* The disguise of the source from which the material was derived does not defeat the protection of the copyright, nor does taking a part of the work constitute an evasion of the copyright. Lawrence v. Dana, [15] Fed.Cas., No. 8,136, 4 Cliff. 80. The appellees did not take all of the copyrighted matter, or all its principal characters, but took one, the idea of the horse 'Sparky.'

"We do not think it avoids the infringement of the copyright to take the substance or idea, and produce it through a different medium, and picturing in shape and details in sufficient imitation to make it a true copy of the character thought of by the appellant's employee. Doing this is omitting the work of the artisan, but appropriating the genius of the artist. Falk v. T. P. Howell & Co., C.C., 37 F. 202." [Emphasis added.]

33. The use of the words "any other version" inserted in the statute by Act of March 4, 1909, c. 320, 35 Stat. 1075, probably was only intended to re-enact existing law. See G. Ricordi & Co. v. Mason, D.C.N.Y.1911, 201 F. 182, affirmed per curiam, 2 Cir., 210 F. 277; and Corcoran v. Montgomery Ward & Co., 9 Cir., 1941, 121 F.2d 572.

The emphasized words from the King case, supra,[34] have been quoted and relied upon in Nutt v. National Institute, etc., 2 Cir., 1929, 31 F.2d 236, 238, and Universal Pictures Co. v. Harold Lloyd Corporation, 9 Cir., 1947, 162 F.2d 354, 361. In the King case, supra, the language was particularly in point since the defendants made a toy horse, fashioned after, labeled, and sold as "Spark Plug" and thereby infringed the plaintiff's copyright to a book of cartoons about a horse named "Spark Plug".

In Falk v. Donaldson, C.C.S.D.N.Y. 1903, 57 F. 32, a lithograph infringed a photograph. In Falk v. T. P. Howell & Co., C.C.S.D.N.Y.1888, 37 F. 202, a photograph was infringed although the infringing design was stamped on leather intended for the bottom or back of a chair. In Bracken v. Rosenthal, C.C.N.D. Ill.1907, 151 F. 136, a photograph of a copyrighted statute was held to infringe. In Rosenthal v. Stein, 9 Cir., 1953, 205 F.2d 633, affirming Stein v. Rosenthal, D.C.Cal.1952, 103 F.Supp. 227, copyrights of statuettes were held infringed by similar statuettes used as bases for electric lights.[35]

### (e) Defendants' authorities.

Defendants think they find some support for their contention that burlesque is a fair use and therefore cannot constitute infringement even if the taking is substantial, by reference to English cases and text book writers. But the exhaustive analysis of these matters by plaintiff in its final brief, utterly shatters any support therein for defendants' position.

Glyn v. Weston Feature Film Co. Ltd., [1916] 1 Ch. 261; 114 L.T.Reports 354, was a trial court opinion based on the facts. The judge found that "the incidents of the film to which even so remote a resemblance with any in the novel can be found are exceedingly few in number or importance * * * on the whole * * * I have arrived at the conclusion of fact that the film does not constitute any infringement of the plaintiff's copyright in the novel." (pp. 267–268). Thus the holding of the case was that the taking was not substantial. Justice Younger's further conclusion that burlesque would not constitute infringement and that "no case can be found * * * in which a burlesque * * * has been treated as an infringement of copyright * * *" (p. 268) was labeled by him as unnecessary for the decision and therefore was dictum.[36] The Glyn case dictum is not considered to correctly state the English law as to burlesque [37] and certainly does not control our case.

Carlton v. Mortimer, McGillivray's Copyright Cases, [1917–23] 194, the sec-

34. King cites Lawrence v. Dana, C.C. Mass.1869, 15 Fed.Cas. pages 26, 59–60, No. 8,136, and in addition to the quote, paraphrases certain other language of Justice Clifford. The word "literary" in King appears as "literal" in Lawrence v. Dana. We find practically the exact quote in the case of Simms v. Stanton, C.C.N.D.Cal.1896, 75 F. 6, 9, except the word "literal" is used instead of "literary". Simms probably took the quote from Lawrence v. Dana.

35. The holding of the case is approved in Mazer v. Stein, 1954, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630, involving a like problem. Rosenthal v. Stein, supra, was one of the cases creating the conflict in Circuits which caused the Supreme Court to allow certiorari in Mazer v. Stein.

36. "If, therefore, it was necessary for me to express an opinion upon this aspect of the case, I should decide that on this ground also plaintiff fails." [114 L.T. Reports 356]. [1916] 1 Ch. 261, 269.

37. 7 Halsburg's Laws of England, [2d Ed. 1932, edited by Lord Hailsham] p. 576, Sec. 893, "* * * if * * * a substantial part of an author's work is taken, it is not material to consider whether the user is fair or unfair * * *". Then follows a note commenting on the Glyn case and the following, "* * * since the * * * Copyright Act of 1911 * * * whereby reproduction in any material form was made an infringement of copyright there can be no justification for a user of copyright material based upon a supposed right to abridge or burlesque." Copinger & Skone James, Law of Copyright, (8th Ed.1948) p. 132, states, "If the burlesque consists of what is, in substance, a new work parody-

ond English case relied on by defendants is merely an extract prepared by the case book editor. Although it makes reference to the dictum in the Glyn case, in reality the case holds that the taking must be substantial and that the "burlesquing of these two trifling incidents * * * under a title which was somewhat similar in sound to, but yet different in fact from, the title of the novel, did not amount to an infringement * * *" (pp. 195–196).[38] Any other significance to be attached the case would be contrary to English law.[39]

The third English case Hanfstaengl v. Empire Palace, [1894] 3 Ch. 109, give defendants no support. The plaintiff was the owner of German copyrights in some paintings. These paintings were more or less reproduced as live tableaux in a theatrical presentation. The tableaux, it was held in prior litigation, did *not* infringe Hanfstaengl's copyright. (Hanf-staengl v. Empire Palace, [1894] 2 Ch. 1). A new complaint was based on the publication, in defendant's newspapers, of rough sketches, not of the *original paintings*, but of the *tableaux*. All that can properly be said to have been decided is that a copy, of a copy which is not itself an infringement of the original, does not infringe, at least when its resemblance to the original is slight and remote.

Defendants' reliance on text writers gives them no better support for their contention. Many of the works cited are not legal treatises but are apparently written for the lay public[40] and in any event they are no more authoritative than the decisions on which they purportedly rely. Most of these writers discuss generally fair use and not specifically burlesque. Weil, Ball and Amdur are specifically contrary to defendants' position.[41]

ing an existing one but not making substantial use of its language or incidents, it is submitted there is no infringement. But a work which slavishly used the plot and incidents of another *would not be defensible under the cloak of burlesque."* [Emphasis added.]
A.D. Russell-Clarke Copyright and Industrial Design [1951] p. 63, after citing Carlton v. Mortimer, McGillivray's Copyright cases [1917–23] 194, (the second of defendant's English cases), states,
"The Court held that these two incidents did not constitute a substantial part of the novel, especially in view of the fact that whereas the incidents in the novel were serious in nature, in the skit they were treated entirely as burlesque. This case raises the question of whether a burlesque can infringe a serious work. It is submitted *that it may be an infringement, the material question for consideration being whether a 'substantial part' of the copyright work is or is not reproduced."* [Emphasis added.]

38. The titles were, "Tarzan of the Apes" and "Warzen and his Apes." Under American law the *title* to a work probably would not be protected by copyright law. Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464; Warner Bros. Pictures, Inc., v. Majestic Pictures Corp., 2 Cir., 1934, 70 F.2d 310, 311; Weissman v. Radio Corp. of America, D.C.N.Y.1948, 80 F.Supp. 612; See, Stanley v. Columbia Broadcasting System, 35 Cal.2d 653, 221 P.2d 73, 23 A.L.R.2d 216, § 18, p. 300; but may be protected under the law of unfair competition. Warner Bros. Pictures, Inc., v. Majestic Pictures Corp., supra, 70 F.2d at page 311; Jackson v. Universal International Pictures Inc., 1950, 36 Cal.2d 116, 222 P.2d 433, holding the author has a property right in a title to a play, when the title has acquired a secondary meaning." See Stanley v. Columbia Broadcasting System, 35 Cal.2d 653, 221 P.2d 73, 23 A.L.R.2d 216, § 19, p. 302.

39. See note No. 37.

40. Nicholson, Shaw, Spring and Lindey. See preface to the works. Shaw is not even a lawyer.

41. For example, although the short excerpt from Weil which defendants give might indicate his accord with them, the fact is that in another section, citing Green v. Luby, supra, 177 F. 287, to his text, he affirms the principle that even burlesque or parody infringes if it takes substantial copyrighted material from the plaintiff. [Weil, Law of Copyright, p. 418, sec. 1097.] In the passages quoted from Ball only fair use in general terms is dealt with. But when Ball, elsewhere in his treatise, refers to Green v. Luby, supra, 177 F. 287, and Hill v. Whalen & Martell, supra, 220 F. 359, his

Spring states, "The right of a fair comment, as to satire or burlesque, has seldom been openly questioned. *Only the extent of use* has been questioned; " and in referring to mimicry or satire which he groups as "parody," states "the element of good faith is essential in parody, i. e., it is essential that the use involved be humorous and be limited to satire, *and that it not be plain copying as a device to sell entertainment by copying another's material.*[42] [Emphasis added.] Lindey states, "Parody * * * is not infringement unless it is a transparent cover-up for stealing." [43]

### (f) Proof of other burlesques.

Defendants argue that they have shown a long established custom of the burlesquing of copyrighted works [44] and acquiescence of this view of the law by persons most interested, and cite 50 Amer. Jur., Statutes, sections 319 and 320, pp. 309 and 312, "indeed the practical construction of a statute, or the meaning publicly given it by contemporary usage, is usually presumed to be the true one," (pp. 309–310) and Sutherland, "Statutory Construction, 3rd Ed., § 5106, p. 518, "interpretations made by those lacking express statutory authority to make

interpretations are given somewhat less weight in the construction of legislation. However, interpretations made by the public and those affected by a law, interpretations resulting from the practice of the Bar, and interpretations made by administrative officials of similar legislations in other jurisdictions may have important bearing as to the meaning of a statute."

Defendants make much of burlesque produced in the past, based on the then current dramatic productions, dwelling at length on "Arizona" and the burlesque of it, "Travesty on Arizona." Both played in the fall of 1900.

But defendants' showing lacks an important element, namely a showing that no consent was given by the holder of the copyright permitting the showing of the burlesques. Conceivably, the owner of the "Arizona" copyright, (1) gave written approval, (2) oral approval, or (3) implied consent,—thinking the burlesque might increase the popularity of his play and purposely doing nothing. Without a showing of an *unconsented use*, defendants' argument falls completely. Nor can we presume consent or lack of consent.[45] Many of the burlesques cited by Dr. Baxter were works long in

---

discussion indicates clearly that he considers them to place limits on the right to appropriate copyrighted material for burlesque. (Ball, Law of Copyright and Literary Property, pp. 290–292, 422.) Similarly Amdur refers to these decisions as showing that fair use does not permit of substantial taking by way of burlesque. (Amdur, Copyright Law and Practice, pp. 748–749, 759–762, 777.)

42. Risks and Rights, pp. 183–186.

43. Plagiarism and Originality, p. 43.

44. Dr. Frank C. Baxter, A.B. and M.A., University of Pennsylvania, Ph.D. University of Cambridge and presently a professor of English Literature at the University of Southern California, was called as an expert witness by defendants. He reviewed the use of burlesque throughout the history of literature. In addition he summarized as follows:
1. Burlesque is a form of comic art, is as old as literature.
2. Burlesque "could not use bitterness or rancor. Burlesque is a happy thing."

3. Burlesque is rarely personal.
4. Burlesque is rarely of a whole work of art.
5. Burlesque changes the tone of the original.
6. It rarely bothers itself with the evil or the sham, the ignominious and the failure.
7. Burlesque is a sort of compliment.
8. It is a manifestation of the comic spirit.
9. Burlesque historically has flourished in those societies where there has been most democratic liberty.
10. Burlesque is a happy toying with serious things.
11. The stage has always laughed at itself.
12. There have been few important novels, verses or plays that have not been burlesqued.

45. After Dr. Baxter listed 18 modern plays or works of which he said burlesques had been made, the following question was asked:—

the public domain. Many were works created long before copyrights existed. No showing was made as to which originals had been copyrighted.[46]

In the case of the 63 burlesques made by Benny, there is as to most of them a similar lack of proof by the defendants. The record shows that in five instances, consent was obtained and that in twelve instances the materials were in the public domain.[47] We cannot speculate as to the remainder.

Assuming for argument some weight to popular construction, the argument falls completely in the absence of proof as to consent or lack of consent to the creation of these burlesques. If for example, consent had been given expressly or impliedly in a number of cases, these cases would be no part of a custom permitting the burlesque of copyrighted material, regardless of consent. The defendants' arguments reminds one of the famous Kipling verse,

When 'Omer Smote 'Is Bloomin' Lyre
_____

When 'Omer smote 'is bloomin' lyre,
He'd 'eard men sing by land an' sea;
An' what he thought 'e might require,
'E went an' took—the same as me!

The market-girls an' fishermen,
The shepherds an' the sailors, too,
They 'eard old songs turn up again,
But kep' it quiet—same as you!

They knew 'e stole; 'e knew they knowed.
They didn't tell, nor make a fuss,
But winked at 'Omer down the road,
An' 'e winked back—the same as us?

To conclude, defendants have shown no custom permitting burlesque or parody of copyrighted material over the objections or regardless of the consent of the copyright holder.

> (g) A substantial taking by use
> of burlesque constitutes
> infringement.

We proceed to a determination of the major question here presented. In the instant case, the economic value of plaintiffs' property far exceeds the value of the defendants' work. Loew's expenditure in production and distribution of "Gaslight" amounted to $2,458,000 as compared with an estimated $64,883.66 by the defendants in their production of the 1952 and 1953 burlesque exclusive of American's compensation to Benny. Television is engaged in active competition with motion pictures. The taking was

"In that connection, in your investigation of course you had no way to ascertain whether or not there was permission?
The Witness: No, I had no knowledge of that." [TR. 51]
And on cross-exam. "Q. Then, having made that much of an analysis, did you carry your researches on to ascertain whether or not the parody or burlesque was issued with the permission of the author of the original? A. No, no." [TR. 86]
Dr. Baxter was asked this question. "Q. In the history of literature, is there any evidence that these numerous burlesques were done with the permission of the owner of the original? A. I know of no case. It may have been, of course, but I rather doubt it. These are independent arts." [TR. 53]

46. Dr. Baxter's testimony.
"Q. Anyway, with regard to these various burlesques that you read in preparation for your testimony, did your investigation extend to ascertaining with

respect to the original or model, or the work which was being burlesqued or parodied, whether that work was one which was protected by any copyright law, or whether it was in the public domain at the time of the appearance of the burlesque? A. No, I did not." [TR. 86].
"Q. Further, in analyzing these various works * * * did you make any investigation to discover whether the state of the law was such at the time that the burlesque appeared, as to make the taking whatever it might have been, lawful or unlawul? A. No, I did not. Legal consideration, of course, is beyond my powers." [TR. 88]

47. Although the court permitted in evidence over plaintiffs' objection, this material from paragraph 13 of the pretrial stipulation, listing Benny's other burlesques, obviously the fact that Benny burlesqued other plays or pictures is no defense to this action, if his acts herein were improper.

for commercial gain for use in a competing entertainment field.

The serious, near tragic vein of the original, "Gaslight" was converted into the broad, low comic vein of the burlesque. Benny, using gags, puns, exaggerated mimicry, slapstick and distortion, all matters within the common fund of the public domain, has taken a substantial part of plaintiffs' property, "Gaslight," and inverted the *mood* from serious to humorous. Tragedy and comedy, like love and hate are but opposite faces of the same coin. Defendants have transposed the work, from the serious to the comic vein. This is analogous to the situation in Leon v. Pacific Telephone & Telegraph Co., 9 Cir., 1937, 91 F.2d 484, supra, when defendant took plaintiff's copyrighted telephone book and inverted the list from an alphabetical one to a numerical one. Our case tests the statement of the court therein that no case can be found holding that "wholesale copying and publication of copyrighted material can ever be fair use." 91 F.2d at page 486.

From the discussion heretofore and the authorities collected we conclude that plaintiffs have a property right in "Gaslight" which defendant may not legally appropriate under the pretense that burlesque as fair use justifies a substantial taking; that parodized or burlesque taking is to be treated no differently from any other appropriation; that, as in all other cases of alleged taking, the issue becomes first one of fact, i. e., what was taken and how substantial was the taking; and if it is determined that there was a substantial taking, infringement exists.

On the other hand, there is no dispute as to the right of the stranger to the copyright to take an incident, a character, a theme, or even a bare plot and then in Dr. Baxter's apt words, "take off into the blue" and create a new work by burlesque,[48] or to make an even more extensive use of the copyrighted material so long as a substantial part is not taken.

That this line between the permissible and the forbidden may be hard to draw does not prevent its application. Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 122, certiorari denied 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795. The taker or user acts at his peril as does anyone who under our system of laws, makes use of another's property.

### III

### Reducing Demand for Plaintiffs' Work Not an Essential to Recovery.

Defendants contend that the decisive test of whether the burlesque of a copyrighted literary property constitutes fair use is whether the burlesque will reduce the demand for the copyrighted work by superseding such work and satisfying the demand of the public therefor. They rely on certain language in Folsom v. March, C.C.Mass.1841, 9 Fed.Cas. pages 342, 344, No. 4901, and in Lawrence v. Dana, C.C.Mass.1869, 15 Fed.Cas. pages 26, 61, No. 8136. All that either of these cases said was that a reviewer may not by his work, "supersede" the original.

Hill v. Whalen & Martell, D.C.N.Y. 1914, 220 F. 359, 360, is relied on when the court says: "One test which, when applicable, would seem to be ordinarily decisive, is whether or not so much as has been reproduced as will materially reduce the demand for the original. * * * The reduction in demand, to be a ground of complaint, must result from

---

48. Dr. Frank Baxter gave a definition of burlesque, as follows:—"I think that is a very excellent synonym for burlesque, take-off from something. It does not parallel in the sense that it just recreates the thing in a new tone, but it takes off from it, selectively, this element, this element, this element, in order to identify this is a burlesque that B is making of A, but it takes off into the blue with all sorts of things. It introduces extraneous materials; it takes one little detail and puffs it up beyond its significance in the original. It leaves out much, but it constantly comes back, so to speak, to refresh itself to the original, and then takes off again. But in no sense parallels the original." [TR. 66–67.]

the partial satisfaction of that demand by the alleged infringing production. A criticism of the original work, which lessened its money value by showing that it was not worth seeing or hearing, could not give any right of action for infringement of copyright. * * *" No authority is cited and the court referred to "fair criticism, serious or humorous", in drawing the conclusions above.

Also relied on are Justice Younger's remarks in Glyn v. Western Features Film Company Ltd., [1916] 1 Ch. 261, 114 L.T.Rep. 354, 356, 1 Ch. 261, 268, that the older English cases "insist upon the necessity of establishing that the alleged piracy is calculated to prejudice the sale or diminish the profits or supersede the objects of the original work, whereas it is well known that a burlesque is usually the best possible advertisement of the original * * *".

But Leon v. Pacific Tel. & Tel. Co., 9 Cir., 1937, 91 F.2d 484, disposes completely of defendants' contentions. There the defendant relied on the fact his numerical telephone directory "serves a different purpose than plaintiff's alphabetical directory." 91 F.2d at pages 486–487 the court said;

"The fact that plaintiff has not chosen to arrange its material in the inverted form used by appellants is no determinant of fair use. The inversion, without license, is not permitted merely because the holder of the copyright has not so used it. This is settled by the case of Fox Film Corporation v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010, where the Supreme Court said: 'The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property.'

"A like conclusion has been expressed by the courts of England.

Weatherby & Sons v. International Horse Agency and Exchange, Ltd., [1910] 2 Ch. 297, 304; 79 L.J.Ch. 609. * * * The court said:

" 'Then it is said that the real and only test as to whether or not the defendants have made an unfair use of volume 21 of the Stud Book lies in the answer to the question whether there will be any competition between such volume and the defendant's book. * * * But, in my opinion, an unfair use may be made of one book in the preparation of another, even if there is no likelihood of competition between the former and the latter. After all copyright is property, and an action will lie even if ro damage be shown. * * *' "

█ The mere absence of competition or injurious effect upon the copyrighted work will not make a use fair. The right of a copyright proprietor to exclude others is absolute and if it has been violated the fact that the infringement will not affect the sale or exploitation of the work or pecuniarily damage him is immaterial. Falk v. Donaldson, C.C.N.Y.1893, 57 F. 32, 36–37; Reed v. Holliday, C.C.Penn.1884, 19 F. 325, 327; Warren v. White & Wyckoff Mfg. Co., D.C.N.Y.1930, 39 F.2d 922, 923; Johns & Johns Printing Co. v. Paull-Pioneer Music Corp., 8 Cir., 1939, 102 F.2d 282; Harms v. Cohen, D.C.Penn.1922, 279 F. 276, 279; MacMillan v. King, D.C.Mass. 1914, 223 F. 862, 867–868.

We have heretofore commented on the impact of competition or the taking for a profit on the scope of fair use.[49]

█ We conclude that it is not incumbent on the copyright holder to show either damage, or a diminuting of the value of his property or a lessening of the demand for the copyrighted work. On the other hand, the fact that the infringing work competes with the copyrighted

49. See also W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 1928, 27 F.2d 82, 89; Karll v. Curtis Pub. Co., D.C. Wis.1941, 39 F.Supp. 836, at page 837;

Sampson & Murdock Co. v. Seaver-Radford Co., 1 Cir., 1905, 140 F. 539, 541–542.

one or has been issued for commercial gain, rather than in the interests of advancement of learning is a factor to be considered in determining the extent of fair use, and in determining whether the taking was substantial.

## IV

### Effect on Burlesque

The defendants make several broad contentions as to the results that would flow from a decision for the defendants, (1) that it would be the death knell to the art of burlesque; (2) that since burlesque has always flourished in democratic countries, such a decision would be a frontal attack on freedom in our democracy.

It seems patent that by 1955 the public domain abounds with material suitable for burlesque, and when there is added thereto the instances where the consent, expressed or implied, of a copyright holder may be obtained, there should be no problem in the defendants obtaining bounteous materials for a pursuit of this art.

Secondly this decision points out that an isolated incident, character, event, theme or setting may still be used by a stranger to the copyright, without consent, under the doctrine of fair use and the newly created burlesque, starting from such a spring board "may take off into the blue" to use Dr. Baxter's apt phrase. We hold only that the stranger to the copyright may not appropriate the whole or a substantial part of the copyrighted material. Fertile minds will experience no difficulty in providing Mr. Benny and others in his fraternity with ample material for the exercise of their special art. We have not sounded a death knell on burlesque; in fact we hope we have cleared the air sufficiently to give it more room for its erratic flights.

As for an attack on freedom, we confess we have difficulty in visualizing the loss of that freedom if Benny's activities are curtailed by this decision. Instead, the decision reaffirms a principle inherent in the democratic way of life—the right to own and enjoy one's own private property without fear of appropriation by another. The concept of private ownership of literary property is equally entitled to protection and is more in danger in this proceeding than are our other freedoms.

## V

### Laches

Defendants claim plaintiffs are barred by laches from obtaining the relief here prayed. Plaintiffs by the pretrial stipulation waived damages and seek only injunction.

 The three burlesques, i. e., the Radio show in 1945,[50] the television show in 1952 and the impounded television show of 1953 are generally and basically the same. Crediting Benny's testimony, the facts show plaintiff consented to the 1945 Radio show. Clearly consent for that particular show and the use of copyrighted material therein, does not impart consent to any other or different use of it. The showing of a copyrighted motion picture at a different time or theatre from that for which license was granted, infringes. Metro-Goldwyn-Mayer etc. v. Bijou Theatre Co., 1 Cir., 1932, 59 F.2d 70; Tiffany Productions, Inc., v. Dewing, D.C.Md.1931, 50 F.2d 911, 912–915; Metro-Goldwyn-Mayer etc. v. Bijou Theatre Co., etc., D.C.Mass.1933, 3 F.Supp. 66, 74; Twentieth-Century Fox Film Corp. v. Peoples Theatres of Alabama, D.C.Ala.1938, 24 F.Supp. 793. The above cases concerned contracts containing specified exhibition dates. An oral license of copyrighted material would give no greater right to use than would a license contained in a written contract, although the copyright proprietor's remedies might well be affected by the terms of the written contract. We think the above cases apply equally to the oral license.

 As to the 1952 television show, Loew's protested promptly on hearing of

---

50. CBS had no connection with this show.

its presentation. It claimed infringement. The fact Loew's did not then commence an action is not a waiver. The dispute over the alleged infringement was never settled.

With this background existing, defendants commenced the preparation and production of the 1953 television show. Loew's on learning about the matter on June 9, 1953, promptly brought this action on June 10, 1953. Defendants in their brief state that they "in reliance upon plaintiffs' conduct, incurred financial obligations" in connection with the 1953 show. We can perceive of no conduct on which defendants were entitled to rely. Defendants' expenditures were made after notice they had infringed by the 1952 showing.

In any event there was no undue delay in commencing the action even as to the 1952 showing. The period involved was from January 27, 1952 to June 9, 1953. Moreover, there are authorities for the proposition that delay alone is not sufficient to establish laches, but that the delay must be inexcusable and prejudicial to the defendant; in other words, that there exist reliance on the unexcused delay by the defendants to their prejudice. Major v. Shaver, 1951, 88 U.S.App. D.C. 148, 187 F.2d 211, 212; Shaffer v. Rector Well Equipment Co., 5 Cir., 1946, 155 F.2d 344, 345; Rome Grader & M. Corp. v. J. D. Adams Mfg. Co., 7 Cir., 1943, 135 F.2d 617, 619. We find the defense of laches bad.

## VI

### Unfair Competition

In the third count, Loew's charges unfair competition and alleges the trade name "Metro-Goldwyn-Mayer" and the title "Gaslight" have each acquired a secondary meaning.

Loew's does not seriously urge this claim and no part of its briefs have been devoted to it. We find the plaintiff has failed to meet its burden of proof.

## VII

### Relief Granted

The first cause of action involves the 1952 T.V. production, exhibited June 27, 1952. No threat has been made to again exhibit this production. Claim for damages have been waived as to all counts of the complaint. In view of the relief granted on the second cause (infra) injunctive relief on the first cause of action will be denied.

The second cause of action incorporates the allegations of the first and then alleged the facts concerning the 1953 T.V. production. The pretrial stipulation provides that defendants intend to and will exhibit these 1953 T.V. films unless restrained by the court. Plaintiff is clearly entitled to injunctive relief on this cause. The fact that the first cause is incorporated by reference in the second, does not hinder relief,—if anything it aids. The 1952 and 1953 productions are very alike. Both infringe plaintiff's copyright. Thus the threatened showing of the 1953 impounded film is an equivalent of another showing of the 1952 production.

The court in its discretion may award attorney's fees to the prevailing party in a copyright infringement action. 17 U.S.C.A. § 116. However, the question presented in this case was a nice one; there were no authorities squarely in point to guide the litigants or their counsel. After plaintiffs' commencement of the action, the matter has been treated as a test case. We think the interest of justice would be best served by refusing to award attorney's fees.

Plaintiff will prepare and serve findings of fact, conclusions of law and a decree within the time allowed by the Rules.