239 F.2d 532
 Jack BENNY, Appellant,
v.
LOEW'S INCORPORATED, a corporation, and Patrick Hamilton, Appellees.
COLUMBIA BROADCASTING SYSTEM, Inc., and American Tobacco Company, Appellants,
v.
LOEW'S INCORPORATED, a corporation, and Patrick Hamilton, Appellees.
 No. 14928.
 United States Court of Appeals Ninth Circuit.
 December 26, 1956.
 
 Wright, Wright, Green & Wright, Loyd Wright, Richard M. Goldwater, Los Angeles, Cal., for appellant Jack Benny.
 O'Melveny & Myers, Homer I. Mitchell, W. B. Carman, Warren M. Christopher, Los Angeles, Cal., for appellants Columbia Broadcasting System and others.
 Allen E. Susman, Herman F. Selvin, Loeb & Loeb, Los Angeles, Cal., for appellee.
 Before BONE, McALLISTER, and CHAMBERS, Circuit Judges.
 McALLISTER, Circuit Judge.
 
 
 1
 Patrick Hamilton, an English author and a British subject, some time prior to December, 1938, conceived and wrote an original play entitled, "Gas Light." It was published and protected by copyright in February, 1939. Shortly thereafter, it was publicly performed in England, first, in Richmond, and later, in London. On December 5, 1941, it was produced as a play in New York under the name, "Angel Street," and had a successful run of 1,295 consecutive performances, extending over a period of more than 37 months.
 
 
 2
 On October 7, 1942, the exclusive motion picture rights for "Gas Light" were acquired by Loew's, Inc., better known under its trade name of Metro-Goldwyn-Mayer.
 
 
 3
 Loew's spent $2,458,000 in the production and distribution of the motion picture photoplay of "Gas Light." The actual making of the film extended over a period of more than two and a half years.
 
 
 4
 In producing the motion picture, Loew's acquired the services of three great artists in the cinema field, Charles Boyer, Ingrid Bergman, and Joseph Cotten.
 
 
 5
 The photoplay, "Gas Light," was exhibited in the United States and fifty-six foreign countries. Approximately fifty-two million persons paid admission to see it. The gross receipts in rentals for the play amounted to $4,857,000.
 
 
 6
 There is no question of the right of the dramatic work to protection under the copyright laws of both Great Britain and the United States.
 
 
 7
 On October 14, 1945, Jack Benny, a successful performer in the field of comedy, after securing Loew's consent to present a parody of "Gas Light" on radio, caused to be written, produced, performed, and broadcast over a national radio network a fifteen-minute burlesque of the play. In preparing the program, the radio writers for Benny had access to the acting script of the motion picture, "Gas Light."
 
 
 8
 More than six years later, on January 27, 1952, the Columbia Broadcasting System caused to be written and produced a half-hour-long television show burlesquing "Gas Light," with Jack Benny in the leading role. It was broadcast over the Columbia Broadcasting System network and was "sponsored" by the American Tobacco Company. Neither Mr. Benny nor the Columbia Broadcasting System nor the American Tobacco Company secured consent from Loew's or Mr. Hamilton to publish and broadcast the television burlesque, or, as it is sometimes called, the parody.
 
 
 9
 Immediately after the presentation of the television show, Loew's dispatched a telegram to the Columbia Broadcasting System, notifying that company that Loew's was the owner of the exclusive rights of production and recording of the play, "Gas Light," and adaptations thereof by means of talking films, sound tracks, and television; that Columbia had used substantial portions of the play in its television program; and that Loew's intended to enforce its rights against infringement. A short time thereafter, counsel for Columbia replied to the above telegram, informing Loew's that its burlesque appropriation of the play, "Gas Light," was a "fair use" of the dramatic work, and that Columbia had the right to parody it as it did in the television show. Loew's, in turn, informed Columbia that the burlesque television show constituted an infringement of the copyright of "Gas Light"; and when Columbia prepared for a similar presentation over several television channels, Loew's filed this action, and secured a temporary restraining order.
 
 
 10
 Upon a trial of the issues, the district court found that the Benny television play was copied in substantial part from Loew's motion picture photoplay, "Gas Light"; that the portion so copied was a substantial part of the copyrighted material in such photoplay; and that the Benny television presentation was an infringement of the copyrighted photoplay, "Gas Light." The court, accordingly, granted injunctive relief, restraining the showing of the television play, all of which appears in the able and comprehensive opinion by Judge James M. Carter, reported in 131 F.Supp. 165.
 
 
 11
 On review, the chief contention advanced by appellants is that the burlesque presentation of "Gas Light" was a "fair use" of appellees' photoplay; that, although the play was copyrighted, and neither Benny, Columbia, nor the American Tobacco Company had received any consent on the part of the copyright owners to adapt the play in the way they did, nevertheless, they had the right to adapt the original copyrighted dramatic work of the author of the play and of the photoplay version as a burlesque, and to present, vend, and appropriate it thus, for their own profit.
 
 
 12
 Appellees submit that the Copyright Act insures to the copyright owners the exclusive right to any lawful use of their property, whereby they may get a profit out of it. They further submit that there is no doctrine of fair use which justifies the appropriation of substantial copyrighted material of a dramatic work without the consent of the copyright owner, whether such appropriation is made for the purpose of pirating the work openly, or under the guise of a burlesque or a parody.
 
 
 13
 In considering the law and its application to this case, the facts themselves are most important. The play is a remarkable dramatic production. As outlined by appellees and somewhat supplemented by the record, the play tells the story of a man who sets out upon a deliberate plan to drive his wife insane. He is motivated in this endeavor by the need of having access to a house which was inherited by his wife and in which they live. Some years prior, he had murdered the aunt of his wife for the sake of some valuable jewels which he had intended to steal, but in which he had been frustrated. His method of achieving his objective of finding the jewels without the wife's knowledge, and, at the same time, avoiding her suspicion, is to keep her attention diverted by inducing in her the belief that she is having hallucinations, suffering great lapses of memory, and gradually losing her mind. He does this by abstracting, without her knowledge, articles which he had entrusted to his wife, and by removing a portrait from the wall, making her believe that she had been responsible for the misplacement of the articles and the removal of the picture, of which she had lost all recollection. He fosters such a belief in her, in part, by causing the servants to bear witness that they did not remove the portrait. The suspense aroused by the picture is focused upon whether he will succeed in his scheme of finding the jewels and driving his wife insane. He fails, because of the intervention of a detective from Scotland Yard who, suspicious of the husband's conduct, has become interested in, and then obviously enamoured, of the heroine. The detective apprehends the husband at the climax of the plot, binds him to a chair in his own home to secure his arrest, and then reveals the truth, which he has learned, to the wife. At her request, she is given an opportunity to talk to the husband, who attempts once again, through his personal charm, to subdue her to his will. She, however, resists. In this scene, at her husband's request, she procures a knife, which he has kept nearby. The suspense is heightened by the question whether she will use the knife to cut her husband's bonds, as he has asked her to do, or whether she has come to a determination to kill him. She does neither, but contents herself with denouncing him, and turning him over to the police.
 
 
 14
 A comparison of appellees' "Gas Light" and the Columbia television show discloses the following: The locale of Loew's photoplay is in the early 1870's when the story begins. In the burlesque television show, the story begins in 1871. The setting is a gloomy old four-story Victorian house. The characters are a murderer, his wife, a detective from Scotland yard, and a maid. The murderer has killed a woman ten years before in this house. (In the Columbia television show, the time of the murder is fifteen years before.) Thereafter, the murderer marries the young girl who has inherited the house from the murdered woman, so that he can pursue his search for the jewels for which he had committed the crime. All of the foregoing is the same in the Columbia television show except that it does not mention that the wife had inherited the house.
 
 
 15
 In carrying out his objective, the husband follows the above mentioned plan of driving his wife insane, so that she may eventually be placed in an asylum. He leaves the house nightly and then secretly returns through another entrance to the attic to search for the jewels. In one of the incidents, the husband questions, in the presence of the wife, the maid, concerning the picture which has been removed from its place on the wall, in spite of the wife's begging the husband not to humiliate her before a servant. The maid denies having touched the picture, and the husband uses this incident also to make his wife believe that she has lost her mind. The husband is finally caught by the Scotland Yard detective, who has deduced that he is the murderer.
 
 
 16
 During the entire play, except at the climax, the wife is deeply in love with her husband and is grieved that he leaves her alone each night. Because of the husband's machinations, she fears that she is losing her mind and repeatedly begs for the sympathy and understanding of her husband, who coldly repels her. The detective from Scotland Yard, who has been noticing the husband's suspicious actions and watching the house for some time, calls on the wife when her husband is away and tells her of his past and of the murder several years previously. In talking with the wife, the detective gets her to admit that she knows it is her husband who is prowling in the attic and making the mysterious noises there at night. Upon the return of the husband, the detective conceals himself in the house, but appears as the husband commences to bully his wife. He then places the husband under arrest, allows the wife to talk with him alone for a few minutes while he waits outside the door, and then, at her call, returns and takes him into custody. The foregoing is similar in both the photoplay and the television play.
 
 
 17
 Title 17 U.S.C.A. § 1, provides, among other matters, that a copyright owner shall have the exclusive right to make any other version of the copyrighted work; to dramatize it, if it be a non-dramatic work; to convert it into a novel or other nondramatic work, if it be a drama; to arrange or adapt it, if it be a musical work; to perform the copyrighted work publicly, if it be a drama; to make or to procure the making of any transcription or record thereof, by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever.
 
 
 18
 The district court found, as a fact, that appellants' television play was copied by them, in substantial part, from appellees' motion picture photoplay, "Gas Light," and that the "part so copied was and is a substantial part of [appellants' television] play, and of the copyrightable and copyrighted material in [appellees'] motion picture photoplay." The district court found as facts "(1) that the locale and period of the works are the same; (2) the main setting is the same; (3) the characters are generally the same; (4) the story points are practically identical; (5) the development of the story, the treatment (except that defendants' treatment is burlesque), the incidents, the sequences of events, the points of suspense, the climax are almost identical and finally, (6) there has been a detailed borrowing of much of the dialogue with some variation in wording. There has been a substantial taking by defendants from the plaintiffs' copyrighted property." 131 F. Supp. 171. Accordingly, the district court found that appellants were guilty of infringement of appellees' photoplay, "Gas Light."
 
 
 19
 The photoplay is an original dramatic work. It deals with incidents familiar in life and fiction, but the grouping of those incidents presents a novel arrangement of events; and it is that originality which is protected by copyright.
 
 
 20
 A comparison of the photoplay and the television play indicates how much was copied. If the material taken by appellants from "Gas Light" is eliminated, there are left only a few gags, and some disconnected and incoherent dialogue. If the television play were presented without appellants' contribution, there would be left the plot, story, principal incidents, and same sequence of events as in the photoplay.
 
 
 21
 A review of the record, a comparison of the scripts of appellees' photoplay and appellants' television play, and a viewing of the motion picture photoplay and the television play, as projected upon the screen — all convince us that the findings of fact of the district court that appellants copied the photoplay in substantial part, and that the part so copied was a substantial part of the television play and of the material in appellees' photoplay, are clearly supported by the evidence.
 
 
 22
 Appellants' chief defense is that the use which they made of appellees' photoplay in their television play was a fair use, by reason of the fact that the material which they appropriated from the motion picture, "Gas Light," was used in the creation of a burlesque, and that by reason of such circumstance, they are not guilty of infringement.
 
 
 23
 The so-called doctrine of fair use of copyrighted material appears in cases in federal courts having to do with compilations, listings, digests, and the like, and is concerned with the use made of prior compilations, listings, and digests. In certain of these cases, it is held that a writer may be guided by earlier copyrighted works, may consult original authorities, and may use those which he considers applicable in support of his own original text; but even in such cases, it is generally held that if he appropriate the fruits of another's labors, without alteration, and without independent research, he violates the rights of the copyright owner. In these instances, as has been said, there are certain to be considerable resemblances, "just as there must be between the work of two persons compiling a directory, or a dictionary, or a guide for railroad trains, or for automobile trips. In such cases the question is whether the writer has availed himself of the earlier writer's work without doing any independent work himself." Chautauqua School of Nursing v. National School of Nursing, 2 Cir., 238 F. 151, 153. See also cases digested in 18 F.Dig., Copyrights, Section 55. But up to the time of the present controversy, no federal court, in any adjudication, has supposed that there was a doctrine of fair use applicable to copying the substance of a dramatic work, and presenting it, with few variations, as a burlesque. The fact that a serious dramatic work is copied practically verbatim, and then presented with actors walking on their hands or with other grotesqueries, does not avoid infringement of the copyright. "Counsel have not disclosed a single authority, nor have we been able to find one, which lends any support to the proposition that wholesale copying and publication of copyrighted material can ever be fair use." Leon v. Pacific Telephone & Telegraph Co., 9 Cir., 91 F.2d 484, 486. (Emphasis supplied.) Whether the audience is gripped with tense emotion in viewing the original drama, or, on the other hand, laughs at the burlesque, does not absolve the copier. Otherwise, any individual or corporation could appropriate, in its entirety, a serious and famous dramatic work, protected by copyright, merely by introducing comic devices of clownish garb, or movement, or facial distortion of the actors, and presenting it as burlesque. One person has the sole right to do this — the copyright owner, inasmuch as, under Title 17 U.S.C.A. § 1, he has the exclusive right to make any other version of the work that he desires. He can have it read or sung or danced or pantomimed or burlesqued, because, in the language of the statute, he has the sole right to "exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever."
 
 
 24
 The fact that it has been Mr. Benny's custom to present from time to time, his, or the Columbia Broadcasting System's "version" of various dramatic works during the past twenty-five years, is no defense to this action for infringement of copyright. Appellants cannot copy and present another's dramatic work as they have in the instance before us, unless they receive the consent of the copyright owner.
 
 
 25
 An apparently alternative contention that the presentation of the burlesque was, in effect, literary or dramatic criticism and, therefore, not subject to an action for infringement of copyright, would seem to be a parody upon the meaning of criticism.
 
 
 26
 The record in this case includes a beguiling dissertation on the history of the drama, of English literature, of parody, and of burlesque, by Dr. Frank C. Baxter, a widely recognized and eminent authority in this field of study. Briefs of appellants' counsel, too, disclose a wealth of literary appreciation. However, there is only a single decisive point in the case: One cannot copy the substance of another's work without infringing his copyright. A burlesque presentation of such a copy is no defense to an action for infringement of copyright. As was said by the district judge, a "parodized or burlesque taking is to be treated no differently from any other appropriation; that, as in all other cases of alleged taking, the issue becomes first one of fact, i. e., what was taken and how substantial was the taking; and if it is determined that there was a substantial taking, infringement exists." 131 F.Supp. 183.
 
 
 27
 The finding of the district court that appellants had copied a substantial part of appellees' photoplay is clearly supported by the evidence. The judgment is affirmed upon the findings of fact and conclusions of law of the district court and for the reasons set forth in the opinion of Judge James M. Carter.