**WALT DISNEY PRODUCTIONS,**
**Plaintiff,**

v.

**The AIR PIRATES et al., Defendants.**

**No. C–71 2021.**

United States District Court,
N. D. California.

July 7, 1972.

Frank D. Tatum, Jr., of Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal., for plaintiff.

Michael Stepanian, San Francisco, Cal., for defendant Ted Richards.

Albert L. Morse, San Francisco, Cal., for defendant Gary Hallgran.

Michael J. Kennedy, San Francisco, Cal., for defendant Dan O'Neill.

David F. Phillips, San Francisco, Cal., for defendant Bobby London.

## OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

WOLLENBERG, District Judge.

Plaintiff, Walt Disney Productions, a California corporation, brought this action against the four individual defendants who are all residents of the Northern District of California, and two business entities operated by them, alleging, in ten causes of action, infringement of seven copyrights (See Appendix A of this opinion), one trademark, and claims of unfair competition.

The most basic facts are undisputed. The plaintiff does hold valid copyrights on the various works noted in the first seven causes of action. The plaintiff caused each of the specified certificates of copyright registration to be issued to it, pursuant to the provisions of the copyright Act. Plaintiff is at present the copyright proprietor of all copyrightable subject matter in those works, as set forth in the respective certificates of copyright registration. Each of those protected works is a series of cartoon drawings; the series range in length from a single page to "book length". Most of the cartoons depict the antics of a limited number of characters which plaintiff has, over a period of time, created and developed, and most of them include dialogue contained in "balloons" over each of the character's heads, with occasional explanatory material in the margin. The series of cartoons, each of which is known as a "panel", are drawn and arranged to form a narrative.

The plaintiff charges that the defendants have infringed the copyrights in each case by copying the graphic depiction of over seventeen characters, each of which was contained in one or more of the copyrighted works. Interestingly, none of those characters is represented as a human being, but most are members of an animal, or, in two cases, insect, species endowed with what would be considered human qualities. By virtue of the artistry of plaintiff's employees, as well as the conceptual framework of the various copyrighted works, the various drawings of each character have a consistency that gives each character a recognizable image quite apart from the setting of the particular panel. In the case of a number of these characters, of which "MICKEY MOUSE" is probably the prime example, the plaintiff has devoted considerable effort and resources to developing a recognition of that image, and exploiting its value in numerous ways. In that effort, plaintiff has been markedly successful.

Each of the individual defendants has participated in the preparation and publication of two "magazines" of cartoons, each cartoon similarly linked to the others in a series with the purpose of telling a story. Those publications are attached to the complaint as Exhibits A and B. In the defendants' cartoons, each of the characters has a characteristic appearance, as do plaintiff's characters. Several of the graphic depictions of characters drawn by defendants bear a marked similarity to the graphic depictions employed by plaintiff in its various publications. In fact with respect to "MICKEY MOUSE", about whom most of the discussion has revolved, the affidavit of defendant O'Neill states: " . . . I chose to parody *exactly* the style of drawing and the characters to

evoke the response created by Disney." [1] While the character was not copied in the sense that it was photographically reproduced, it was drawn as nearly like the plaintiff's drawing as defendant could make it. The name given the character so "copied" was the same name used in plaintiff's works.

There can, on the other hand, be no question but that the theme and "plot" of the defendants' publications differ markedly from those of plaintiff. While plaintiff claims that it seeks to foster for itself "an image of innocent delightfulness", the defendants assert that they seek to convey a message of significance, although couched in allegorical terms. The depth of the message aside, defendants' image could not fairly be called innocent. A deeper appreciation of the peculiar genius of the works of each of the parties is unnecessary to an understanding of the decision here. In the graphic depiction of a number of the most prominent characters, and in the names given those characters, the respective works are the same. In nearly every other aspect, they are different.

Upon institution of this action, plaintiff sought and was granted a temporary restraining order barring defendants from further distribution of the allegedly infringing material, pending hearing on this motion. By stipulation the restraining order continued in effect through several continuances of the time set for hearing of the motion and then up to the time of entry of this opinion and order. Despite the making of that stipulation, the defendants have made it clear that they would continue the course of conduct of which plaintiff complains in the absence of any contrary order of this Court. This Court does have jurisdiction of plaintiff's cause of action for copyright infringement under the provisions of the Copyright Act of March 4, 1909, as amended.

## THE ISSUES

■ It is elementary that plaintiff must, in order to prevail on its motion for a preliminary injunction against distribution of defendants' publications, demonstrate 1) irreparable injury and 2) likelihood of success on the merits. If the irreparable injury may not be presumed from plaintiff's concededly valid copyrights, and in all probability it may be,[2] the showing that plaintiff has here made of the probability of damage to the image which it has developed for itself would justify the issuance of an injunction upon a determination that plaintiffs are likely to succeed at trial. The difficult question, then, is that likelihood of success. The defendants argue that the plaintiff's characters, as distinguished from the whole copyrighted work, are not protected by the copyright statutes, that even if they are protected, the use made of them here was a fair use, that even if the use cannot be classified as fair, still the defendants' conduct is protected by the First Amendment guarantees of freedom of speech and press. Further, defendants urge that there has been no trademark infringement or unfair competition.

The Court has determined that sufficient likelihood of success on the claims of copyright infringement has been shown to justify the granting of the preliminary relief sought.

## ARE PLAINTIFF'S CHARACTERS PROTECTIBLE?

The threshold issue in this matter is whether the graphic depiction of each of the various characters noted in the first seven causes of action are protected by the copyrights. In each case, at least an entire "strip", consisting of several car-

---

1. O'Neill Affidavit, p. 1, ln. 31—p. 2, ln. 1. Whatever the affiant may have meant by his use of "parody" in this context, the Court is able to discern no attempt at caricature of plaintiff's drawings of Mickey Mouse.

2. Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851, 852 n. 1 (2nd Cir. 1967), and cases there cited.

toon panels was the subject of plaintiff's copyright. In several instances, the copyright covered· a book. Plaintiffs argue that the provisions of § 3 of the Act extend the protection to the graphic depiction as a "copyrightable component part" of the whole work. Defendants assert that because they have extracted characters from the work, the isolated characters are not protectible.

The authorities cited by plaintiff furnish direct support for its position. King Features Syndicate v. Fleischer, 299 F. 533 (2d Cir. 1924) dealt with the imitation of a comic strip character, an unlikely race-horse named Spark Plug, and its reproduction in the form of a toy or doll. The Court upheld a finding of infringement, upon the theory urged here, that the "pictorial illustration", or graphic depiction was a copyrightable component part of the entire work covered by an admittedly valid copyright. Accord, Fleischer Studios v. Ralph A. Freundlich, 73 F.2d 276 (2d Cir. 1934), and Hill v. Whalen & Martell, Inc., 220 F. 359 (S.D.N.Y.1914). In each of those cases, the Court found that the drawings, or graphic depictions, were sufficiently distinctive and defined to be protectible.

Defendants attempt to distinguish the cases cited above upon the ground that each involved an infringer which was trying to imitate the whole style and approach, as it were, of the holder of the copyright. That distinction, however, misses the issue, for protectibility as to a component part depends not at all upon the manner in which the alleged infringer acts, but strictly upon the status of the questioned part within the protected whole, and the characteristics and quality of that part, considered by itself.

Defendants, however, cite many cases in support of the proposition that "characters" as such are not generally copyrightable. They correctly assert that the leading case for that proposition is Warner Brothers Pictures v. Columbia Broadcasting System, 216 F.2d

945 (9th Cir. 1954). That case, like many others in the field, has come to be popularly known for the literary character about whom the dispute revolved, hence, the "Sam Spade Case". The author of a detective story sold rights to the book, *The Maltese Falcon*, to a motion picture studio. He then assigned rights in the characters, exclusive of their use in the *Falcon*, to other parties, which parties produced radio dramatizations, including "The Kandy Tooth", centering around the same Sam Spade and many of the other supporting characters, but using different plots. The decision of the Court of Appeals held that there was no infringement of the rights transferred in *The Maltese Falcon*. Primarily, that holding was premised upon construction of the contract, drawn by the assignee of the rights, with the result that the rights over the characters themselves were held not to have been conveyed. *As an alternative rationale*, the Court then analysed whether the characters in issue were subject to copyright protection at all, for if they were not covered by *The Maltese Falcon* copyright, there could in no event be any infringement. The decision stated:

"We conclude that even if the Owners assigned their complete rights in the copyright to the Falcon, such assignment did not prevent the author from using the characters used therein, in other stories. The characters were vehicles for the story told, and the vehicles did not go with the sale of the story." 216 F.2d at 950.

On the peculiar facts and alignment of the parties in the Warner Bros. v. Columbia Broadcasting case, the decision had the result of reserving to the author, the original holder of the copyright, the right to use his characters, or assign the right to use them to "B", even after assigning rights in the first work in which those characters appeared to "A". The difficulty lies in the holding that the characters were not copyrightable. The Court did not expressly state, and it was unnecessary to the de-

cision there to do so, that the "character rights", after first publication, were in the public domain. The characters there had been used only with the permission of the author. Here, the defendants assert with considerable force, that a conclusion that such character rights are in the public domain is necessarily implied by the rationale of the decision of the Ninth Circuit. If so, and the position seems well-taken, the decision offers a strange sort of protection to the author described as trying to make a living from a finite assortment of ideas.[3]

Whether the alternative holding on the scope of copyright protection is an example of the hard case making bad law, is simply not relevant here, for the Ninth Circuit decision binds this Court.[4] Similarly, the criticism which the decision has drawn [5] is a matter to be considered by that Court, not this, if at all. The Court's research indicates that that Court has not discussed its holding in any subsequent case.

Plaintiff here urges, however, that since Warner Bros. v. Columbia Broadcasting was concerned with literary characters, rather than cartoon creatures, it has no application to the issues here presented. That proposition is by no means as self-evident as plaintiff would suggest. Plaintiff has cited no Ninth Circuit law on the issue of cartoon characters' protectibility by copyright, and the decisions from other Circuits, noted above,[6] were not distinguished in the Warner Bros. decision. An analysis of the cases from all circuits would certainly lead one to the conclusion that courts have tended to deal with cartoon characters rather differently than they have with literary characters, but the cases have not really explained the basis of the distinction. The issue of protectibility of characters found in literature had been commented upon,[7] but never squarely decided, prior to the Warner Bros. case, but the cartoon characters had been ruled clearly protectible in decisions much earlier in time. The attempts by the commentators to introduce coherence into the collection of the dicta and holding of the various cases really avails the plaintiff little, for those attempts proceed upon the thesis that if cartoon characters are protectible, so should sufficiently delineated characters of literature, that is that a carefully drawn word picture should be protected as would a graphic representation in a cartoon.[8] That sugges-

---

3. Compare, The District Court decision in the same case, Warner Bros. Pictures v. Columbia Broadcasting System, 102 F. Supp. 141 (S.D.Cal.1951). Judge Mathes found the characters uncopyrightable but protected by the author's common law rights. It seems quite clear that the Ninth Circuit opinion eschews this common law protection theory, leaving it only with the alternative of casting the character rights into the public domain. On the novelty of the District Court's theory, see Nimmer, Copyright 1955, 43 Cal.L.R. 791, 792–3.

4. Dragor Shipping Corp. v. Union Tank Car Co., 371 F.2d 722, 726 (9th Cir. 1967) citing Woods v. Interstate Realty, 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524. Both of those cases dealt precisely with the situation here presented: alternative grounds for the decision. Although commentators have suggested that the discussion of the breadth of copyright protection be regarded merely as *dicta*, and at least two other circuits have construed the case to hold nothing in that regard, Columbia Broadcasting v. De-Costa, 377 F.2d 315, 320 (1st Cir. 1967); Goodis v. United Artists Television, Inc., 425 F.2d 397, 406 (2nd Cir. 1970), a fair analysis of the opinion precludes either conclusion.

5. Nimmer, On Copyright, § 30, pp. 134.2–134.3 (1963); Netterville, Copyright and Tort Aspects of Parody, Mimicry, and Humorous Commentary, 35 So.Cal.L.R. 225, 243–45 (1962), [hereinafter, cited as Netterville]; Nimmer, Copyright 1955, 43 Cal.L.R. 791, 793–95 (1955).

6. King Features Snydicate v. Fleischer, *supra*; Fleischer Studios v. Ralph A. Freundlich, *supra*; Hill v. Whalen & Martell, Inc., *supra*.

7. See, Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2nd Cir. 1930).

8. See, e. g. Nimmer, On Copyright, supra, at 134.1–134.2.

tion amounts to a criticism of the *Warner Bros.* case, but does not suggest a way that that decision would admit of a different rule for cartoons.

The *Warner Bros.* holding did not purport to shut the door entirely on protection for characters.

> "It is conceivable that the character really constitutes the story being told, but if the character is only the chessman in the game of telling the story he is not within the area of the protection afforded by the copyright." 216 F.2d at 950.

It would seem to be a narrow gap indeed which the Court left open. The commentators have been able to suggest only one work of literature which might qualify.[9] Do the characters created by the plaintiff, or any of them, come within the ambit of that conceivable category? Plaintiff does not expressly argue that they do. Both plaintiff and defendants do agree that the depiction of each character as it has been developed by plaintiff has achieved a high degree of "recognition" or "identification". To an extent much greater than a mere name, the distinctive style in which each character is drawn conjures up in a world-wide audience, the parties agree, associations with rather extensive groupings of traits, characteristics and qualities. This recognition, plaintiff asserts, persists "[l]ong after the particular circumstances in which they have been depicted have been forgotten . . . ", and there is little reason to assume that the defendants would take issue with that assertion. Does that amount to saying that the character "really constitutes the story being told"? After all, the character is graphically represented many, many times, in the course of each series of panels. The facial expressions, position and movements represented may convey far more than the words set out as dialogue in the "balloon" hovering over the character's head, or the explanatory material appended. It is not simply one particular drawing, in one isolated cartoon "panel" for which plaintiff seeks protection, but rather it is the common features of all of the drawings of that character appearing in the copyrighted work.

On the other hand, an examination of the copyrighted works of plaintiff readily discloses that the plot of the piece not only centers around the character but is quite subordinated to the character's role. The principal appeal of each of the plaintiff's works to the primary audience of children for which they were intended lies with the character and nothing else.

█ In terms of both quantity and quality, if the Ninth Circuit determined that cartoon characters were to be judged by the *Warner Bros.* standard, then several, if not all, of plaintiff's characters would meet the requisite standard for protection. If, on the other hand, the Ninth Circuit determined that cartoon characters are to be distinguished from literary characters, in keeping with the decisions in other circuits, then, also, in view of the unique qualities embodied in plaintiff's drawings, they would surely be held protectible under the copyright of the work, as component parts.

## IS THE DEFENSE OF FAIR USE AVAILABLE TO THESE DEFENDANTS?

Having determined that the cartoon characters are afforded copyright protection, other issues must be resolved in order to determine whether plaintiff has shown sufficient likelihood of success on its infringement action to justify the issuance of a preliminary injunction. Viewed from one perspective, the issue is whether plaintiff can show that there was the substantial taking requisite to prove a claim of infringement of the copyrighted works. More narrowly phrased, can it be determined that plain-

---

9. See, e. g. Nimmer, Copyright 1955, 43 Cal.L.R. 791 (1955), where the author notes at 794 that Aldous Huxley's Point Counterpoint might possibly qualify.

tiff is likely to prevail over the claimed defense of fair use?

■ Unlike the state of the law on the basic issue of protectibility, the law of the Ninth Circuit on the test to be here applied is quite clearly stated in Benny v. Loew's Incorporated, 239 F.2d 532 (9th Cir. 1956), aff'd by an equally divided court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed. 2d 583 (1958). While the Supreme Court decision is without precedential value, neither party has suggested that the decision of the Ninth Circuit in that case does not have the same authoritative position in this Circuit as would any decision from that court. As such, this Court is constrained to follow it. The test there stated was that a claim of infringement is made out when it is shown that the defendants have copied the substantial part of the protected work and that the part so copied was a substantial part of the defendants' work. A good bit has been said by other courts on the subject since that decision, and much of what has been said was in response to the rule it established.[10] It has surely not escaped attention from the commentators, and much of the comment has not been favorable.[11] So far as can be determined, however, the Ninth Circuit has not spoken again on the subject. That essentially leaves this Court with the task of applying the *Benny* rule to the facts of the instant case.

The determination of this Court that the characters and their graphic depiction are protectible under the Ninth Circuit standard as component parts of the copyrighted work, really disposes of the issue of whether a substantial part was taken. In the Court's view, the characters and their depiction is the *raison*

*d'etre* of the cartoons of plaintiff here in issue. Granting that the variations in plot and in dialogue might well not be much greater than they in fact are here from plaintiff's to defendants' works, still the borrowing of characters is the borrowing of a substantial portion of plaintiff's protected works, and a substantial contribution to the work of defendants. Abstraction of the characters and, of course, their graphic depiction, would leave the work of both parties with very little.

As has been noted, the defendants freely concede such borrowing with respect to the character Mickey Mouse. A comparison of the depictions of several of the other characters allegedly copied demonstrates that plaintiff's claims are not without foundation. In each instance of such use, wherever a name has been bestowed upon a character by the defendants, it has been the name given by the plaintiff. It is not necessary to a determination of this motion for preliminary relief to decide whether each character in issue was in fact copied, and whether defendants have infringed each of the seven copyrights noted in the complaint. Likelihood of success on any one of the seven causes of action would justify issuance of the injunction sought.

■ Defendants argue that they have taken no more than the minimum necessary to make possible a parody upon the plaintiff's works. The Court need not pause to attempt to make a literary judgment as to the true character of defendants' works. Nor is the Court obliged to determine whether the defendants' contention that the allegedly infringing work is literary criticism or

10. Rosemont Enterprises v. Random House, 366 F.2d 303 (2d Cir. 1966); Berlin v. E. C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964); See, Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348 (S.D.Cal.1955), decided by the same District Judge who earlier decided Loews, Inc. v. Columbia Broadcasting System, Inc., 131 F.Supp. 165 (S.D. Cal.1955), aff'd sub nom., Benny v. Loews, Inc., 239 F.2d 532 (9th Cir. 1956).

11. See, E. g. Yankwich, Parody and Burlesque in the Law of Copyright, 33 Can. B.Rev. 1130 (1955); Netterville, at 231–239; Nimmer On Copyright, supra at 646–52; but see, Selvin, Parody and Burlesque of Copyrighted Works as Infringement, 6 Bull.Copyright Soc. U.S.A. 53 (1958) [Mr. Selvin was counsel for the prevailing party in Benny v. Loews, Inc.]

the riposte that such a contention "would seem to be a parody on criticism.", 239 F.2d at 537, holds the greater truth. Assume that all of defendants' affidavits attesting to the literary value of defendants' works are to be credited, the answer still must be: "One cannot copy the substance of another's work without infringing his copyright." 239 F.2d at 537. It need not be determined whether parody would, in fact, be possible, by taking less, for example by caricaturing the plaintiff's characters,[12] or whether some degree of such lesser taking would be permissible. The Court is in no position to dictate a mode of literary expression to the defendants, nor to decide cases not before it. To determine this case, it is only necessary to find that the defendants here have crossed the line, which "wherever it is drawn will seem arbitrary"[13], separating fair use and infringement. The Court so finds.

## DO THE FIRST AMENDMENT GUARANTEES OF FREE SPEECH AND PRESS PROTECT DEFENDANTS' CONDUCT?

The determination that the defense of fair use could not be successfully asserted here would seem to resolve the further contention that the First Amendment works to prevent issuance of a preliminary injunction. In arguing for a balancing of the competing interests of the First Amendment and the Copyright Clause of the Constitution, counsel for defendants O'Neill and London would subordinate the copyright interests of plaintiff to the free expression of defendants' ideas only when ". . . there is no presentation of any substantial portion of the older work, disguised as parody . . .", among other conditions. The defense of fair use is unavailable precisely because there is a probability that plaintiff will be able to show that there has been a substantial taking from the protected works. To extend the First Amendment protection to cover this case would serve to obliterate copyright protection in any instance in which the alleged infringer could claim the intent to convey an idea. There may be some difficulty in discerning the significant content of the ideas which the defendants are expressing; to those less gifted than the defendants' affiants, the defendants' works might appear to have as much ideological import as plaintiff's works, indeed the defendants would appear at one point to premise their argument on the assumption that there is a significant message in plaintiff's works.[14] Yet the defendants still staunchly maintain that there is really no conflict between their work and the plaintiff's because the plaintiff seeks to convey no ideological message, but only to entertain and make money, while they are seeking to criticize through satire and parody.[15] However defendants would have it, the hard fact remains that both parties are dealing in cartoon series, comic books or strips, and that the mode which the defendants have chosen for the expression of their concepts amounts to a substantial taking of plaintiff's expression of its concepts, even assuming vast difference in the content of those concepts. It can scarcely be maintained that there is *no* other means available to defendants to convey the message they have, nor is it even clear that other means are not available within the chosen genre of comics and cartoons.[16] To paraphrase, it is true that it would be easier to copy substantial portions of the expression as distinguished from the idea itself of the Disney works, but the value of such labor-saving utility is far outweighed by the copyright interest in encouraging creation by protecting expression. Nimmer, Does Copyright Abridge the First Amendment Guarantees of Free Speech

12. Netterville, at 241–43.

13. Nichols v. Universal Pictures, 45 F.2d at 119.

14. Brief of defendants O'Neill and London, pp. 40–43.

15. Brief of defendants O'Neill and London, p. 44.

16. See, n. 12 supra.

and Press, 17 U.C.L.A.L.Rev. 1180, 1202 (1970).

It is of some significance to note that the two cases which have touched on the area of First Amendment-Copyright Clause relations had no holding that the First Amendment allowed infringement which the doctrine of fair use was held not to permit. In both Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966) and Time, Incorporated v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968), the Court's holding was that public interest was a factor to be considered in determining whether the use had been fair. As has been discussed above, that issue is simply not relevant in determining fair use under the Ninth Circuit rule. The discussion of First Amendment principles in Judge Lumbard's concurring opinion in *Rosemont Enterprises* was in the most general terms, and probably could not be considered more than dicta were it the opinion of the Court; those general expressions really do not aid the defendants here, for there is no allegation that the plaintiff is attempting to interfere, as a general matter, "with the public's right to be informed regarding matters of general interest" or matters associated simply with the Disney characters.

■ Under none of the tests that have been suggested for balancing the competing interests of freedom of expression and protection for those who first express in a particular form, can the defendants prevail. Assuming, without deciding, that the First Amendment does mark out some boundary for the protection that may be afforded a creator under the copyright laws, that boundary has not been reached here.

In view of the determination made that plaintiff's cartoon characters are entitled to copyright protection, that plaintiff will be able to prove infringement of the relevant copyrights and that defendants have no defense of fair use or otherwise, it is not necessary to consider plaintiff's other claims of trademark infringement, and unfair competition.

This opinion shall constitute the Findings of Fact and Conclusions of Law pursuant to Rule 52(a), F.R.Civ.P.

Now, therefore, it is hereby ordered and adjudged that:

1. Defendants, The Air Pirates, Hell Comics, Dan O'Neill, Ted Richards, Gary Hallgren, and Bobby London, their officers, directors, employees, agents and servants, and all those acting in concert with them, are hereby enjoined pending this action, from infringing any copyrights of plaintiff in any manner, from printing, making, manufacturing, publishing, selling, marketing, displaying for sale or otherwise turning to account any copies or counterparts of the publications entitled "Mickey Mouse Meets the Air Pirates" and "Air Pirates" Funnies and attached to the complaint as Exhibits A and B, any further issues of said publications, or any other publications or objects which infringe any of plaintiff's copyrights.

2. Said defendants, their officers, directors, employees, agents and servants, and all those acting in concert with them, and each of them, forthwith and no later than 12:00 noon on Monday, July 17, 1972, deliver up to this Court for impounding during the pendency of this action all copies in their possession, custody or control of the publications attached to the Complaint herein as Exhibits A and B and all plates, molds, prints or other matter for making copies of said publications or any other publication or other object infringing any copyrights of plaintiff in any manner.

### APPENDIX A

The publications and respective copyright registration certificates set forth in the plaintiff's complaint are as follows:

(a) Cartoon strips identified in certificate of copyright registration No. AA385043 (renewal No. R450229);

(b) Comic magazine identified in certificate of copyright registration No. A281221;

(c) Comic magazine identified in certificate of copyright registration No. A17607;

(d) Comic magazine identified in certificate of copyright registration No. B127623;

(e) Comic magazine identified in certificate of copyright registration No. B268056;

(f) Cartoon strips identified in certificate of copyright registration No. K81665;

(g) A book identified in certificate of copyright registration No. A176974.